[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-12260
_____

D.C. Docket No. 1:13-cv-20076-JAL

ANIMAL LEGAL DEFENSE FUND,
ORCA NETWORK,
PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC.,
HOWARD GARRETT,
SHELBY PROIE,
PATRICIA SYKES,
KAREN MUNRO,

Plaintiffs – Appellants,

SHELBY PROIE,
PATRICIA SYKES,

Plaintiffs,

versus

U.S. DEPARTMENT OF AGRICULTURE,
SECRETARY, U.S. DEPARTMENT OF AGRICULTURE,
ELIZABETH GOLDENTYER,
in her official capacity as Eastern Regional Director of the
United States of Agriculture Animal and Plant Health Inspection Service,
MARINE EXHIBITION CORPORATION,
d/b/a/ Miami Seaquarium,

Defendants – Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(June 15, 2015)

Before HULL, BLACK and MELLOY,[*] Circuit Judges.

BLACK, Circuit Judge:

The Animal Legal Defense Fund, Orca Network, People for the Ethical Treatment of Animals, Inc., Howard Garrett, and Karen Munro (collectively, ALDF)[1] appeal the district court's grant of summary judgment in favor of the United States Department of Agriculture; Tom Vilsack, in his official capacity as Secretary of the United States Department of Agriculture; and Elizabeth Goldentyer, in her official capacity as Eastern Regional Director of the United States Department of Agriculture Animal and Plant Health Inspection Service (collectively, USDA). ALDF argues the district court erred in ruling USDA's decision to renew Marine Exhibition Corporation d/b/a Miami Seaquarium's (Seaquarium) license did not violate the Animal Welfare Act (AWA), 7 U.S.C. §§ 2131–59. According to ALDF, USDA may not renew a license when USDA

---

[*] The Honorable Michael J. Melloy, United States Circuit Judge for the Eighth Circuit, sitting by designation.

[1] Pursuant to Federal Rule of Appellate Procedure 42(b), Appellants moved to dismiss the appeal as to Shelby Proie and Patricia Sykes, on the basis that Proie's current employment prohibits her from being involved in the litigation and Sykes is now deceased. This Court granted the motion to dismiss the appeal without prejudice as to Proie and dismissed the appeal of Sykes as moot. Proie and Sykes are therefore no longer parties to this appeal.

knows an exhibitor is noncompliant with any animal welfare standards on the anniversary of the day USDA originally issued the license.[2]

Congress has prescribed what an exhibitor must do to obtain *issuance* of a license in the first instance, but Congress has not spoken precisely to the question of license *renewal* under the AWA.  USDA in turn has adopted comprehensive renewal regulations.  USDA's renewal scheme requires Seaquarium to submit a form summarily certifying its regulatory compliance, a fee, and an annual report setting forth the number of exhibited animals.  No annual inspection occurs.  Given the thousands of exhibitors across the country and its limited resources, USDA conducts license renewal through a purely administrative procedure.

USDA has adopted a different mechanism to achieve substantive compliance with animal welfare standards.  The USDA regulations provide for random, unannounced inspections to verify substantive compliance with the AWA.  When violations are discovered, either through inspections or third-party complaints, the USDA can charge Seaquarium and seek to suspend or revoke its license after

---

[2]  There is some confusion arising from USDA's characterization of ALDF's argument. USDA believes ALDF has argued the license renewal scheme is unlawful "because the regulations do not require a demonstration of compliance with the AWA prior to renewal." (USDA Response Brief at 2.)  In its reply brief, though, ALDF clarifies that it "make[s] no such argument," and does not seek annual inspections of exhibitor facilities.  (ALDF Reply Brief at 1.)  Rather, ALDF "challenge[s] the USDA's specific decision to renew the license of Seaquarium despite evidence that the facility is in violation of several Welfare Act standards." (*Id.*) (emphasis removed).  For the purposes of this appeal, we assume, without deciding, that USDA renewed the license despite knowing there was evidence Seaquarium was violating several AWA standards.

requisite due process.  USDA must provide notice to Seaquarium by filing a complaint before an administrative law judge (ALJ) who conducts a hearing in accordance with detailed rules of administrative practice.  The ALJ's decision is then subject to judicial review exclusively in the United States Court of Appeals.

USDA's licensing regulations constitute a reasonable policy choice balancing the conflicting congressional aims of due process and animal welfare, and the AWA licensing scheme is entitled to deference by this court.  We therefore affirm.  As explained below, assuming Seaquarium violated a substantive AWA standard, the remedy in this case lies not in the administrative license renewal scheme, but in USDA's power to initiate an enforcement proceeding.  USDA has the discretionary enforcement authority to revoke a license due to noncompliance.  Only Congress, not this Court, possesses the power to limit the agency's discretion and demand annual, substantive compliance with animal welfare standards.

## I.  BACKGROUND[3]

### A.  Lolita

Lolita is a 20-feet long, 7000 pound *Orcinus orca*[4] held in captivity at Seaquarium.  In 1970, Ted Griffin, the first person to swim with an orca in a public

---

[3]  We recount the facts in the light most favorable to USDA.

[4]  The *Orcinus orca* is colloquially known by the misnomer "killer whale."  The creature is not actually a whale; rather, it is the world's largest member of the dolphin family called Delphinidae.  Both whales and dolphins are members of an entirely aquatic group of mammals known as cetaceans.  For the sake of scientific accuracy, we refer to Lolita as an orca.

exhibition, captured Lolita in Whidbey Island's Penn Cove, off the coast of Washington State. Lolita was approximately three to six years old and a member of the Southern Resident L Pod. Seaquarium purchased Lolita, and she has lived there since September 24, 1970. Lolita performs each day in an event called the "Killer Whale and Dolphin Show."

Lolita lives in a tank which is surrounded by stadium seating. The stadium covering leaves Lolita exposed to ultraviolet radiation as she floats along the water's surface. As sunscreen, Seaquarium applies a black-colored zinc oxide on Lolita's skin. The effect of this sunscreen on Lolita's physiology is unknown. ALDF alleges Seaquarium's failure to provide Lolita with adequate sun cover violates 9 C.F.R. § 3.103(b)'s requirement to afford adequate protection from the weather or direct sunlight to marine animals kept outdoors.

Lolita's tank is oblong-shaped with a 5 feet 2 inches wide, crescent-shaped concrete platform that extends from the bottom of the tank through the surface of the water. Lolita's trainers stand on this platform during her performances. Her tank measures 80 feet by 60 feet. The concrete platform leaves an unobstructed circular pool of 80 feet by 35 feet. ALDF alleges Lolita's tank is smaller than the 48 feet minimum horizontal standard permitted by agency regulation. *See id.* § 3.104(b) (providing cetaceans in captivity must be given a pool of water with a minimum horizontal dimension of at least "two times the average adult length" of

5

the species).

Orcas are primarily social in the wild and travel in large groups.  Lolita has not interacted with another orca since Hugo, who was also captured off the coast of Washington State, died in March 1980.  Lolita instead shares her tank with Pacific white-sided dolphins.  ALDF alleges these dolphins are not "biologically related" to her, as prescribed by 9 C.F.R. § 3.109.

## B.  Renewal of Seaquarium's License

Seaquarium received an AWA license from USDA.  Each April since the issuance of the license, USDA has renewed Seaquarium's license before its one-year expiration date.  On February 16, 2012, before the expiration of Seaquarium's license in April 2012, ALDF sent a letter to USDA alleging Seaquarium exhibited Lolita in violation of 9 C.F.R. §§ 3.103(b), 3104(b), and 3.109.  ALDF stated Lolita's living conditions were inhumane and the renewal of Seaquarium's license would be unlawful.  In a March 28, 2012 letter, Goldentyer responded to ALDF's letter, stating USDA intended to renew Seaquarium's exhibitor license because it found Seaquarium was in "compliance with the regulations and standards, and none of the other criteria for license denial under Section 2.11 or 2.12 are applicable."  USDA renewed Seaquarium's license on April 21, 2012.

## C.  License Renewal Regulations

6

The AWA prohibits exhibitors[5] from exhibiting any animals unless they "have obtained a license from the Secretary and such license shall not have been suspended or revoked." 7 U.S.C. § 2134. "[N]o such license shall be issued" until the exhibitor "shall have demonstrated that his facilities comply with the standards promulgated by the Secretary." *Id.* § 2133. In addition to this statutory command, the AWA vests USDA with the authority to "promulgate such rules, regulations, and orders as he may deem necessary in order effectuate the purposes" of the statute. 7 U.S.C. § 2151. Pursuant to this section, USDA has adopted comprehensive renewal regulations that combine purely administrative requirements, random inspections, and discretionary enforcement proceedings.

On or before the expiration date of his or her one-year license, an exhibitor must submit a completed application form to the appropriate USDA regional office fulfilling three, purely administrative criteria. *See* 9 C.F.R. § 2.1(d). First, the exhibitor certifies by signing the application form that, to the best of her knowledge or belief, she is compliant and will continue to comply with all AWA animal wildlife standards. *Id.* § 2.2(b). Second, the exhibitor pays an annual fee calculated according to USDA's fee schedule that varies according to the number of animals owned, held, or exhibited. *Id.* § 2.6. Third, the exhibitor submits an

---

[5] The AWA defines an "exhibitor" as "any person . . . exhibiting any animals, which were purchased in commerce or the intended distribution of which affects commerce, or will affect commerce, to the public for compensation." 7 U.S.C. § 2132(h).

7

annual report detailing the number of animals owned, held, or exhibited.  *Id.*

§ 2.7(d).  So long as an exhibitor meets these three criteria, even if her facility fails

to comply with animal wildlife standards on the license expiration date, USDA

must grant her a renewal.  *See id.* § 2.2(b) (stating "[USDA] will issue a license"

after applicant fulfills administrative requirements).  Otherwise, the license

automatically terminates due to expiration.  *Id.* § 2.5(b).

Unlike the purely administrative procedure for renewing a license, USDA's

mechanism for suspending or terminating licenses due to animal welfare violations

depends on random inspections and enforcement proceedings.  Each applicant for

renewal is obligated to make her "animals, premises, facilities, vehicles,

equipment, other premises, and records available for inspection . . . to ascertain the

applicant's compliance with the standards and regulations."  *Id.* § 2.3(a).  USDA's

administrative renewal scheme facilitates these inspections by requiring a licensee

to "promptly notify [USDA] by certified mail of any change in the name, address,

management, or substantial control or ownership of his business or operation, or of

any additional sites, within 10 days of any change."  *Id.* § 2.8.  In addition to

random inspections, any interested person may submit information to USDA

regarding alleged violations by a licensee.  7 C.F.R. § 1.133(a)(1); *see also* 9

C.F.R. § 4.1 (applying USDA's Uniform Rules of Practice for adjudicatory

proceedings to section 19 of the AWA (codified at 7 U.S.C. § 2149)).  In response,

8

USDA can choose to investigate the submission if, in the opinion of the agency, such an investigation is "justified by the facts."  7 C.F.R. § 1.133(a)(3).[6]

Under the AWA's supplemental rules of procedure, USDA may suspend a license temporarily for 21 days upon written notification before an opportunity for notice and hearing if USDA has reason to believe a licensee has violated or is violating the AWA.  9 C.F.R. § 4.10.  If, on the basis of inspections or the receipt of third-party information, USDA chooses to suspend a license for more than 21 days, impose a civil penalty, or terminate a license, USDA must afford notice and a hearing in an enforcement proceeding.  *Id.* § 2.12 (stating "license may be terminated during the license renewal process . . . after a hearing in accordance with the applicable rules of practice").   An interested person who submits a third-party complaint to the agency "shall not be a party to any proceeding which may be instituted as a result thereof."  7 C.F.R. § 1.133(a)(4).

USDA initiates the enforcement proceeding by filing a complaint with the USDA Hearing Clerk, *id.* § 1.133(b)(1), who assigns the case to an ALJ that conducts the proceeding according to formal rules of evidence and procedure, *see id.* § 1.133–51.  Unless a licensee subject to an ALJ's adverse decision appeals to a Judicial Officer appointed by the Secretary of Agriculture, that decision becomes a final order.  *Id.* § 1.145(i).  Finally, the licensee may appeal an order that is final

---

[6]  It is during this time period, when USDA discovers evidence of AWA violations, that USDA undertakes the cooperative enforcement measures described *infra* at Section III(*B*)(*2*)(*b*).

for the purposes of judicial review to the United States Court of Appeals of the circuit in which she resides or has her principal office, or in the District of Columbia Circuit.  7 U.S.C. § 2149(c); 28 U.S.C. § 2343.

## D.  ALDF's Complaint

On August 22, 2012, ALDF filed a complaint against USDA for declaratory and injunctive relief in the United States District Court for the Northern District of California.  The complaint alleged Seaquarium houses Lolita in conditions that violate the AWA's standards for granting a license pursuant to 7 U.S.C. §§ 2133–34.  ALDF alleged USDA acted unlawfully by (1) renewing Seaquarium's license in April 2012 and (2) routinely renewing Seaquarium's AWA license each year.  Pursuant to 5 U.S.C. § 706(2)(A), (C) of the Administrative Procedure Act (APA), ALDF requested the district court to set aside the USDA's April 2012 decision to renew Seaquarium's license, award reasonable attorneys' fees and costs, and grant any further relief deemed just and proper.  The Northern District of California granted Seaquarium's motion to intervene and USDA's 28 U.S.C. § 1404(a) motion to transfer the case to the Southern District of Florida.

## E.  Motion for Summary Judgment

USDA moved for summary judgment.  USDA argued ALDF confused the *issuance* of a license with the annual *renewal* of a license.  While 7 U.S.C. § 2133 requires a demonstration of compliance with the Secretary's standards before

10

"such license shall be issued," USDA asserted the AWA is silent as to any requirements for renewal of a license already issued. Since the AWA did not explicitly address renewal, USDA promulgated administrative renewal regulations to fill this statutory gap. USDA argued these regulations are a permissible construction of the AWA.

In response, ALDF asserted the AWA's animal welfare compliance requirement unambiguously applies to initial licenses *and* license renewals; therefore, USDA violated § 2133 when it renewed the license despite Seaquarium's alleged failure to comply with applicable AWA standards. Further, USDA's distinction between an issuance and a renewal was simply a *post hoc* litigation strategy not entitled to deference. ALDF also claimed USDA's interpretation was an unreasonable construction of the statute because it would render the entire licensing scheme "virtually meaningless." Exhibitors like Seaquarium could keep receiving licenses even if USDA knows they are blatantly violating AWA standards.

F.  *District Court Order*

The district court granted summary judgment to USDA. The district court did not request or examine the administrative record because the material facts were not in dispute and the only contested issue was a pure question of law. Applying the two-step framework of *Chevron U.S.A., Inc. v. Natural Resources*

11

*Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778 (1984), the district court ruled Congress had not spoken to the precise question of license renewal under the AWA because  the text and legislative history were silent as to the requirements and procedure for renewal.  Accordingly, USDA was free to implement its own administrative renewal scheme.

Under *Chevron* Step Two, the district court concluded USDA's renewal process was a permissible construction of the statute.  USDA had adopted a purely administrative renewal scheme requiring a licensee to submit a certification of regulatory compliance, payment of an annual fee, and submission of an annual report detailing the number of animals owned, held, or exhibited during the prior year.  This administrative scheme was coupled with a random, unannounced inspection program that, according to USDA, secured AWA compliance more efficiently than an annual inspection program.  Accordingly, the district court held USDA's decision to renew Seaquarium's license despite alleged noncompliance with animal welfare standards did not violate 7 U.S.C. § 2133.  ALDF filed a timely notice of appeal.

## II.  STANDARD OF REVIEW

"We review questions of subject matter jurisdiction de novo." *Yunker v. Allianceone Receivables Mgmt., Inc.*, 701 F.3d 369, 372 n.2 (11th Cir. 2012) (italics omitted).  "We review a summary judgment ruling de novo, applying the

12

same legal standards used by the district court." *See Johnson v. Bd. of Regents of Univ. of Ga.*, 263 F.3d 1234, 1242 (11th Cir. 2001).  In conducting this examination, we view the materials presented and all factual inferences in the light most favorable to the nonmoving party.  *See Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608 (1970).  Summary judgment is appropriate where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

## III. DISCUSSION

### A.  Judicial Reviewability

Before discussing the merits of the district court's summary judgment motion, we address a threshold issue regarding this Court's subject matter jurisdiction over the present controversy.  *See Scarfo v. Ginsberg*, 175 F.3d 957, 960 (11th Cir. 1999) ("[P]arties cannot waive subject matter jurisdiction, and we may consider subject matter jurisdiction claims at any time during litigation.").

ALDF brings this suit for judicial review of USDA's agency action pursuant to 5 U.S.C. § 702.  Section 702 provides that any "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  *Id.* This provision is inapplicable, however, to the extent "agency action is committed to agency discretion by law."  *Id.* § 701(a)(2).  Whether an agency action is

13

reviewable under § 701(a)(2) is a matter of subject matter jurisdiction.  *See Lenis v. U.S. Attorney Gen.*, 525 F.3d 1291, 1293–94 (11th Cir. 2008); *but see Sierra Club v. Jackson*, 648 F.3d 848, 853–54 (D.C. Cir. 2011) (holding agency decisions excluded from judicial review by § 701(a)(2) are not justiciable because relief cannot be granted, but courts still retain subject matter jurisdiction over such controversies).

The Supreme Court has held § 701(a)(2) precludes APA review whenever the statute under which the agency acts "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion"— that is, where a court would have "no law to apply."  *Heckler v. Chaney*, 470 U.S. 821, 830–31, 105 S. Ct. 1649, 1655 (1985) (internal quotation marks omitted). Due to the general unsuitability for judicial review of agency decisions to refuse enforcement, a presumption arises that such decisions are committed to agency discretion by law and thus unreviewable.  *Id.* at 832, 105 S. Ct. at 1656 (holding "an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)"); *see also Conservancy of Sw. Fla. v. U.S. Fish & Wildlife Serv.*, 677 F.3d 1073, 1084 (11th Cir. 2012) (same).

The presumption of unreviewability does not apply to this case.  ALDF does not seek an injunction requiring USDA to initiate enforcement proceedings against

14

Seaquarium.[7] Instead, ALDF seeks a judicial order setting aside USDA's affirmative decision to renew Seaquarium's license in April 2012. This case is about an "affirmative act of approval under a statute," *Heckler*, 470 U.S. at 831, 105 S. Ct. at 1655, in particular, USDA's affirmative decision to renew Seaquarium's license in April 2012. *See id.* at 832, 105 S. Ct. at 1656 (stating an agency's refusal to act "does not infringe upon areas that courts often are called upon to protect," as opposed to affirmative agency action that "itself provides a focus for judicial review, inasmuch as the agency must have exercised its power in some manner").

USDA's decision was not committed to agency discretion by law so as to render it unreviewable. The AWA provides "meaningful standard[s]" against which to judge USDA's exercise of discretion. *See id.* at 821, 105 S. Ct. at 1655 We accordingly hold USDA's renewal of Seaquarium's April 2012 license is a final agency action subject to judicial review under § 706(2).

## B. AWA Requirements for License Renewal

To determine whether USDA's decision to renew Seaquarium's license in April 2012 must be set aside as unlawful under 5 U.S.C. § 706(2), we evaluate the merits of USDA's interpretation of the AWA's licensing requirements. In doing

---

[7] Both parties acknowledge that if ALDF sought an injunction requiring the agency to initiate an enforcement proceeding against Seaquarium, this Court would lack subject matter jurisdiction.

15

so, we apply the two-step framework formulated in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S. Ct. 2778 (1984). Under *Chevron*, we afford deference to certain agency interpretations because "[i]f Congress has explicitly left a gap for the agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation." *Id.* at 843–44, 104 S. Ct. at 2782. Unlike courts, who "are not experts in the field, and are not part of either political branch of the Government," agencies possess invaluable technical expertise and, by virtue of their accountability to the President, are a proper forum to make policy choices based on unresolved "competing interests." *Id.* at 865–66, 104 S. Ct. at 2793.

### 1. Chevron Step One

When reviewing an agency's construction of a statute it administers, we first decide whether Congress has directly spoken to the question at issue. *Id.* at 842, 104 S. Ct. at 2781. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842–43, 104 S. Ct. at 2781.

To decide if the intent of Congress is clear, we employ traditional tools of statutory construction. *See id.* at 843 n.9, 104 S. Ct. at 2781 n.9. These include "examination of the text of the statute, its structure, and its stated purpose." *Miami–Dade Cnty. v. EPA*, 529 F.3d 1049, 1063 (11th Cir. 2008). "As with any

16

question of statutory interpretation, we begin by examining the text of the statute to determine whether its meaning is clear." *Harry v. Marchant*, 291 F.3d 767, 770 (11th Cir. 2002) (en banc). This is because "we presume that Congress said what it meant and meant what it said." *Id.* (quotation omitted).

### a. Statutory language

The precise question before us is whether USDA may renew a license even if it knows an exhibitor is not compliant with AWA standards governing "the humane handling, care, treatment, and transportation of animals," 7 U.S.C. § 2143(a)(1), on the anniversary of the date USDA originally issued the license. For example, if USDA issues a license on January 1, 2010, and USDA knows an exhibitor is violating an AWA standard when the clock strikes 12:01am on January 1, 2011, may USDA still renew the license? To answer whether Congress has directly spoken to this question, we turn to the plain language of 7 U.S.C. § 2133, which provides:

> The Secretary shall issue licenses to dealers and exhibitors upon application therefor in such form and manner as he may prescribe and upon payment of such fee established pursuant to 2153 of this title: *Provided*, That no such license shall be issued until the dealer or exhibitor shall have demonstrated that his facilities comply with the standards promulgated by the Secretary pursuant to section 2143 of this title . . . .

The parties dispute whether the word "issue" unambiguously encompasses the word "renew."

17

"Issue" is not defined in the AWA.  In the absence of a statutory definition, "we look to the common usage of words for their meaning." *Consol. Bank, N.A., Hialeah, Fla. v. U.S. Dep't of Treasury*, *Office of Comptroller of Currency*, 118 F.3d 1461, 1464 (11th Cir. 1997).  "Issue" is defined, in the sense linguistically relevant to the circumstances here, as "to come out, go out," "to proceed or come forth from a usually specified source," or "to cause to appear or become available by officially putting forth or distributing or granting or proclaiming or promulgating."  WEBSTER'S NEW INTERNATIONAL DICTIONARY 1201 (3d ed. 1976).[8]

The word "renew" is also not defined in the AWA, nor does it even appear anywhere in the statute.  "Renew" means "to make new again," "to restore to fullness or sufficiency," or "to grant or obtain an extension of."  *Id.* at 1922.

Comparing these two definitions, we conclude the plain meaning of "issue" does not necessarily include "renew."  Rather than make a license "come out" or "go out," one could "restore to fullness" a license that has already "come out" or "gone out."  In fact, that is precisely the type of licensing regime USDA has established under the AWA.  USDA makes a license "go out" once an applicant has met the requirements for an issuance.  After USDA makes the license go out, it

---

[8] We have chosen to use a 1976 dictionary because it is more contemporaneous to the 1966 enactment of the AWA than a modern edition.  *See Taniguchi v. Kan Pac. Saipan, Ltd.*, ___ U.S. ___, 132 S. Ct. 1997, 2003 n.2 (2012) (using "contemporaneous dictionaries" to elucidate meaning of statutory term).

remains "valid and effective" unless the licensee fails to comply with the administrative renewal process.  *See* 9 C.F.R. § 2.5(a) (stating a "license issued under this part shall be valid and effective" unless "revoked or suspended pursuant to section 19 of the Act").  No license is given out during the renewal process; instead, the exhibitor maintains the same license number.  Based on our analysis of § 2133 standing alone, we cannot conclude Congress has spoken to the precise question at issue.

Whether a statutory term is unambiguous, however, does not turn solely on dictionary definitions of its component words.  Rather, "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S. Ct. 843, 846 (1997).  "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy." *United States v. Heirs of Boisdoré*, 49 U.S. (8 How.) 113, 122 (1850).  Examination of the whole AWA statute strengthens USDA's argument that Congress did not unambiguously require compliance with animal welfare standards on the date of license renewal.

In particular, Congress's enactment of the AWA's § 2149 enforcement provision severely undermines the assertion Congress conditioned license renewal

19

on an exhibitor's compliance with AWA standards on the anniversary of the date

USDA originally issued the license.  The heading of § 2149 is "Violations by

licensees."  *See Almendarez-Torres v. United States*, 523 U.S. 224, 234, 118 S. Ct.

1219, 1226 (1998) ("[T]he title of a statute and the heading of a section are tools

available for the resolution of a doubt about the meaning of a statute." (internal

quotation marks omitted)).  As the heading suggests, § 2149 spells out the

adjudicative process for punishing a licensee, *i.e.*, one who already holds a license,

*see* WEBSTER'S NEW INTERNATIONAL DICTIONARY 1304 (3d ed. 1976) (defining

licensee as "a licensed person").  Section 2149(a) says:

> If the Secretary has reason to believe that any person licensed as a
> dealer, exhibitor, or operator of an auction sale subject to section
> 2142 of this title, has violated or is violating any provision of this
> chapter, or any of the rules or regulations or standards promulgated by
> the Secretary hereunder, he may suspend such person's license
> temporarily, but not to exceed 21 days, and after notice and
> opportunity for hearing, may suspend for such additional period as he
> may specify, or revoke such license, if such violation is determined to
> have occurred.

Subsection (c) authorizes judicial review of final USDA enforcement orders

exclusively in the United States Courts of Appeals.

If § 2133 mandated the revocation of a license whenever USDA thinks the

exhibitor has failed to demonstrate compliance on an anniversary date, the due

process protections afforded to licensees in § 2149 would be mere surplusage.  *See*

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 698, 115

S. Ct. 2407, 2413 (1995) ("A reluctance to treat statutory terms as surplusage supports the reasonableness of the Secretary's interpretation."). To revoke a license, USDA would not need to bring an enforcement proceeding against a licensee; the agency could patiently bide its time until the license anniversary rolled around, then immediately revoke the license for failure to demonstrate compliance. The exhibitor would have no right to a hearing, nor would she have a right to appeal the denial of her renewal application. In light of the protracted time often necessary to litigate a final agency decision through an appeal, USDA would have no reason to initiate any enforcement proceedings against licensees. Surely Congress did not enact § 2149 to lull licensees into relying on due process protections that do not actually exist.

Moving beyond the AWA itself, a survey of § 2133's relationship to the whole United States Code shows issuing a license is not unambiguously the same as renewing one. *See Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 528, 109 S. Ct. 1981, 1994  (1989) (Scalia, J., concurring) (remarking a statute should be understood in a manner "most compatible with the surrounding body of law into which the provision must be integrated—a compatibility which, by a benign fiction, we assume Congress always has in mind"). Whereas Congress did not explicitly address renewal in the AWA, Congress has demonstrated an ability to address renewal when it intends to do so. *See, e.g.*, 7 U.S.C. § 85 (stating

21

Secretary "may refuse to renew . . . any license"); 12 U.S.C. § 5105(a) (discussing "minimum standards for license renewal"); 16 U.S.C. § 808 (setting forth detailed renewal process); 46 U.S.C. § 7106(a) (stating "license issued" may be "renewed for additional 5-year periods"); 47 U.S.C. § 1421(b)(2) (describing "renewal" of "initial license").

"Where Congress knows how to say something but chooses not to, its silence is controlling." *In re Haas*, 48 F.3d 1153, 1156 (11th Cir. 1995), *abrogated on other grounds by In re Griffith*, 206 F.3d 1389 (11th Cir. 2000). Congress could have unequivocally conditioned license renewal upon demonstrated compliance with AWA standards on the anniversary of license issuance, but chose instead to limit § 2133's language to issuance alone. On this question, "more important than what Congress said" in § 2133 "is what Congress left unsaid." *See Gonzalez v. Reno*, 212 F.3d 1338, 1348 (11th Cir. 2000). Since the AWA does not mandate a renewal procedure at all, much less prescribe the "particulars of that procedure," *id.*, Congress has conferred USDA the discretion to implement an administrative renewal scheme for AWA licenses.

In sum, the plain language of the statute shows Congress has not directly spoken to whether USDA can renew a license despite knowing that an exhibitor is noncompliant with animal welfare standards on the anniversary of the day USDA originally issued the license. The terms "issue" and "renew" have distinct

22

meanings; § 2149's due process protections would be meaningless if we adopted ALDF's interpretation; and Congress's silence regarding renewal is controlling.

### b. Legislative history

When, as here, the words of Congress are clear, "we need not resort to legislative history, and we certainly should not do so to undermine the plain meaning of the statutory language." *Harris v. Garner*, 216 F.3d 970, 976 (11th Cir. 2000) (en banc). We nonetheless examine the AWA's legislative history because it is consistent with our conclusion that Congress has not spoken directly to the question of license renewal. *See id.* at 977 (discussing legislative history consistent with plain meaning); *United States v. Fields*, 500 F.3d 1327, 1330 (11th Cir.2007) ("[W]e look to the legislative history of the statute to determine whether Congress provided any guidance concerning its intent."). Like the statutory language itself, the most striking feature of the AWA's legislative history is its almost total silence regarding renewal.

As with the current statute, none of the prior versions of the AWA mention license renewal. Congress enacted the AWA in 1966. *See* Laboratory Animal Welfare Act, PUB. L. NO. 89-544, 80 STAT. 350 (1966). Section 3 stated the "Secretary shall issue licenses to dealers upon application therefor in such form and manner as he may prescribe," provided that "no such license shall be issued until the dealer shall have demonstrated that his facilities comply with the

23

standards promulgated by the Secretary pursuant to section 13 of this Act." *Id.* § 3, 80 Stat. at 351. Also like the current version of the AWA, Congress authorized USDA to suspend a license through enforcement proceedings safeguarded by notice, hearing, and appeal. *Id.* § 19, 80 Stat. at 352. The word renewal is conspicuously absent, and the topic is omitted from the bill's congressional reports. *See generally* H.R. REP. NO. 89-1848 (1966) (Conf. Rep.); S. REP. NO. 89-1281 (1966).

Subsequent amendments never discussed license renewal or fundamentally altered the scheme for revoking licenses. *See* Animal Welfare Act of 1970, PUB. L. NO. 91-579, 80 STAT. 1560; Animal Welfare Act Amendments of 1976, PUB. L. NO. 94-279, 90 STAT. 417; Food Security Act of 1985, PUB. L. NO. 99-198, §§ 1751– 59, 99 STAT. 1354, 1645–50; Food, Agriculture, Conservation, and Trade Act of 1990, PUB. L. NO. 101-624, § 2503, 104 STAT. 3359, 4066–68; Farm Security and Rural Investments Acts of 2002, PUB. L. NO. 107-171, §§ 10301–05, 116 STAT. 134, 491–94. In sum, Congress has never squarely addressed the precise question at issue.

The parties' and our independent research have revealed only two exceptions to this legislative silence. The first exception appears in H.R. 3556, 87th Cong. § 10–11 (as reported by S. Comm. on Interstate and Foreign Commerce, Sept. 28–29, 1962), an unenacted bill sponsored by Rep. Morgan M.

24

Moulder of Missouri in 1962.  This unenacted bill would have required persons conducting animal research to obtain a "letter of qualification," *id.* § 10, similar to a "license" under the current statute.  Interestingly, the letter would be "valid for no more than one year," but would "be renewed by the Commissioner if renewal is requested, subject to the requirements for an original letter of qualification."  *Id.* § 11.  Thus, Rep. Moulder's bill contemplated a renewal procedure as to individual letters of qualification conditioned upon annual compliance.  By contrast, with regard to the "certificate of compliance" issued to the laboratory itself, the bill established no separate compliance requirement for renewal.  *Id.* § 7–9, 12.  Section 15 instead established a method for suspending or revoking a certificate of compliance through notice via mail and publication in the Federal Register.  *Id.* § 15.

Considered alone, the bill's text lends credence to USDA's argument that Congress considered whether to condition license renewal upon annual compliance with animal welfare standards but declined to do so when enacting the AWA.  Under these particular circumstances, however, we decline to infer any such conclusion when (1) neither the bill nor a subsequent version were enacted into law, (2) the bill was proposed in the 87th rather than 89th Congress, (3) and Rep. Moulder did not hold office after the 87th Congress, *see MOULDER, Morgan Moore*, BIOGRAPHIC DIRECTORY OF THE U.S. CONGRESS,

25

http://bioguide.congress.gov/scripts/biodisplay.pl?index=M001045 (last visited

March 28, 2015).  The connection between Rep. Moulder's bill introduced in

subcommittee and the AWA's passage in 1966 is simply too attenuated to divine

Congress's intent.

The second exception to the legislative silence regarding AWA license

renewal appears in Rep. George E. Brown, Jr. of California's remarks inserted into

the Congressional Record on June 13, 1995.  *See* 141 CONG. REC. E1239–40

(1995) (statement of Rep. George E. Brown, Jr.).  According to Rep. Brown, who

was "intimately involved in the 1985 amendments to the Animal Welfare Act,"

> It was clearly the intent of Congress that facilities should come into compliance before being issued the initial registrations, and that license renewals should be withheld where licenses have been suspended or revoked or in instances where facilities are not in compliance with the provisions of the act.

*Id.*    ALDF argues Rep. Brown's statement shows Congress unambiguously

intended to withhold any license—whether an issuance or renewal—from an out-

of-compliance applicant.

Rep. Brown's statement lacks persuasive force.  Though the Congressman

may have assisted in crafting the 1985 amendments to the AWA, those

amendments made no alterations to the AWA's licensing provisions.  Furthermore,

Congress passed the 1985 amendments 19 years after 1966—the year Congress

enacted the AWA language relevant to this appeal.  Rep. Brown's opinion provides

negligible insight into Congress's intent. *See Chrysler Corp. v. Brown*, 441 U.S. 281, 311, 99 S. Ct. 1705, 1722 (1979) ("The remarks of a single legislator . . . are not controlling in analyzing legislative history.").

In addition to legislative silence, USDA's regulatory actions since the AWA's passage in 1966, combined with Congress's inaction, further suggest Congress has not spoken directly to the precise question under consideration. "Ordinarily, and quite appropriately, courts are slow to attribute significance" to legislative acquiescence. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 600, 103 S. Ct. 2017, 2032 (1983). Here, however, one can draw an inference of ambiguity, however minimal, from Congress's inaction.

USDA has drawn a lengthy and unerring distinction between AWA license issuance versus renewal. USDA promulgated its first regulations interpreting the AWA on February 24, 1967. *See* Laboratory Animal Welfare, 32 Fed. Reg. 3270 (Feb. 24, 1967). Section 2.4 was titled "Issuance of licenses," and USDA could not "issue[]" a license absent a prior demonstration of compliance. *Id.* at 3271. By contrast, § 2.8 was titled "Renewal and termination." *Id.* In order to renew a license and avoid automatic termination, a licensee had to fulfill two purely administrative annual requirements: (1) file a form documenting specified dollar receipts and (2) pay a renewal fee. *Id.*

27

The significance of the contrast between § 2.4 (issuance) and § 2.8 (renewal) is highlighted by § 2.5, titled "Duration of license." *Id.* Section 2.5 laid out three, independent methods by which a license may be terminated. *Id.* First, under subsection (a), a license could be "revoked or suspended" for failure to comply with AWA standards after notice, hearing, and appeal. *Id.* Second, under subsection (b), a license could be "automatically terminated" pursuant to § 2.8, which governs renewal. *Id.* Third, under subsection (c), a license could be "voluntarily terminated" upon the licensee's request. *Id.* It has thus been clear since 1967 that USDA regulations do not authorize automatic termination for failure to comply with animal welfare standards. Automatic termination occurs only if a licensee fails to meet its purely administrative obligations.

Subsequent versions of the regulations have maintained this distinction. *See, e.g.*, Animal Welfare, 54 Fed. Reg. 36123-01 (Aug. 31, 1989); Animal Welfare, Licensing and Records, 60 Fed. Reg. 13893-01 (Mar. 15, 1995); Animal Welfare, Inspection, Licensing, and Procurement of Animals, 69 Fed. Reg. 42089-01 (July 14, 2004). Despite this nearly half-century old interpretation, the legislative history does not disclose any serious attempt to overturn USDA's 1967 rulemaking. Congress's legislative acquiescence adds weight to USDA's proposition that 7 U.S.C. § 2133 is ambiguous as to license renewal.

After applying the traditional canons of statutory interpretation to both the relevant text and legislative history, we find Congress has not spoken directly to whether the AWA prohibits USDA from renewing a license when USDA knows an exhibitor has failed to comply with the standards governing the humane handling, care, treatment and transportation of animals on the anniversary date of his or her license.  Accordingly, we proceed to Chevron Step Two.

### 2.  *Chevron Step Two*

Under Chevron Step Two, the question for this Court is "whether the agency's answer is based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 843, 104 S. Ct. at 2782.  Because Congress has expressly delegated authority to USDA to elucidate the meaning of 7 U.S.C. § 2133 through regulation, those regulations "are given controlling weight unless arbitrary, capricious, or manifestly contrary to the statute."  *Id.* at 843–44, 104 S. Ct. at 2782.  If USDA's construction of the statute is reasonable in light of the policies committed to its care by the AWA, this Court may not substitute its own construction of the statutory provision.  *Id.* at 845, 104 S. Ct. at 2783.  Our duty is to decide whether USDA's construction is a reasonable one in light of the statutory scheme.  *Id.*

### a.  *Post hoc rationalization*

We initially address ALDF's assertion that USDA's license renewal scheme is not entitled to *Chevron* deference because USDA's view is merely a litigation

position and not a reasoned interpretation of the AWA.  "An after-the-fact rationalization of agency action—an explanation developed for the sole purpose of defending in court the agency's acts"—is not entitled to deference.  *Gonzalez*, 212 F.3d at 1350; *see also Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S. Ct. 239, 246 (1962) ("The courts may not accept appellate counsel's post hoc rationalizations for agency action.").  ALDF raises two reasons why USDA's interpretation is merely a post hoc rationalization.  We address each in turn.

First, ALDF argues Goldentyer's March 28, 2012 letter demonstrates USDA, prior to this litigation, considered demonstrated compliance a statutory prerequisite for AWA license renewal.[9]  The letter says USDA intended to renew

---

[9]  Though ALDF mentioned Goldentyer's letter in its complaint and briefing before the district court, ALDF never submitted the letter itself into this Court's record.  ALDF filed a motion with this Court to supplement the record with the letter from Goldentyer.  ALDF asks us to admit the letter pursuant to Federal Rule of Appellate Procedure 10(e)(2) or, in the alternative, this Court's equitable powers.

We deny the motion to supplement pursuant to Rule 10(e)(2). The Rule states "[i]f anything material to either party is omitted from or misstated in the record by error or accident, the omission or misstatement may be corrected" by the court of appeals.  Supplementation under Rule 10(e)(2) is not warranted because the parties never presented the letter to the district court, nor did they inadvertently omit the letter from the record.  *See Ross v. Kemp*, 785 F.2d 1467, 1474 (11th Cir. 1986) ("Because the information in the affidavits was not before the district court in any form, and because neither of the parties relied on the evidence at an earlier point in the proceedings, Fed. R. App. P. 10(e) is inapplicable . . . .").

We also decline to admit the letter pursuant to our equitable powers because its admission would not establish beyond any doubt the proper resolution of the pending issues.  *See CSX Transp., Inc. v. City of Garden City*, 235 F.3d 1325, 1330 (11th Cir. 2000) ("A primary factor which we consider in deciding a motion to supplement the record is whether acceptance of the proffered material into the record would establish beyond any doubt the proper resolution of the

30

Seaquarium's exhibitor license because it found Seaquarium was in "compliance with the regulations and standards, and none of the other criteria for license denial under Section 2.11 or 2.12 are applicable."  Contrary to ALDF's protestations, the letter does not prove USDA's interpretation of 7 U.S.C. § 2133 is a post hoc litigation position.[10]

As discussed above, USDA first articulated its license renewal policy not during this litigation, but in 1967.  *See* Laboratory Animal Welfare, 32 Fed. Reg. 3720, 3721, §§ 2.4–2.5 (Feb. 24, 1967) (setting independent requirements for license issuance versus renewal).  While Goldentyer's letter "may not harmonize perfectly" with earlier USDA interpretations, *Gonzalez*, 212 F.3d at 1350, this is not a case where the agency's position is "wholly unsupported by regulations, rulings, or administrative practice," *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 212, 109 S. Ct. 468, 473–74 (1988).  Put another way, one paragraph, from one letter, from one regional administrator, does not outweigh an agency's

pending issues."). With regard to the post hoc litigation argument explained *infra*, this letter alone does not outweigh the USDA's statutory interpretation embodied in notice-and-comment rulemaking for nearly fifty years.  With regard to the administrative record issue explained *infra* in footnote 13, the district court did not err in disregarding the administrative record because examining the record would have been pointless.  Supplementing the record with the letter would thus not substantially aid the resolution of the issues on appeal.

[10] Although we deny the motion to supplement the record, we still take notice and consider those portions of the letter quoted in ALDF's complaint.  Again, we assume, without deciding, that USDA renewed the license despite knowing there was evidence Seaquarium was violating several AWA standards.  *See supra* footnote 2.

statutory interpretation embodied in notice-and-comment rulemaking for nearly fifty years.

Second, ALDF contends USDA's interpretation is inconsistent with its own regulations. ALDF trains its attention on two regulations: 9 C.F.R. § 2.1(c)(2) and § 2.3(a).

Under § 2.1(c)(2), a license will be issued when the "applicant has paid the application fee of $10 and the annual license fee indicated in § 2.6 to the appropriate Animal Care regional office for an initial license, and, in the case of a license renewal, the annual license fee has been received by the appropriate Animal Care regional office on or before the expiration date of the license." ALDF argues the regulation says a "license renewal" is "issued," thus contradicting USDA's interpretation that "issue" in 7 U.S.C. § 2133 does not apply to renewal.

The other allegedly inconsistent regulation is § 2.3(a). According to § 2.3(a), "[e]ach applicant" shall demonstrate his or her compliance with the AWA standards, and "[e]ach applicant for an initial license or license renewal" shall make itself available for inspection. ALDF argues this subsection establishes that renewal applicants, just like initial applicants, are required to comply with AWA standards before USDA makes any licensing decision.

ALDF reads too much significance into these two (and the USDA admits)

32

poorly drafted regulatory subsections.  Under well-established administrative law, courts defer to an agency's consistent interpretation of its own regulation, "which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation."  *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S. Ct. 1215, 1217 (1945).  Such deference is due particularly when the agency "has made a written interpretation of the regulation or has maintained a longstanding policy on the subject."  *McKee v. Sullivan*, 903 F.2d 1436, 1438 n.3 (11th Cir. 1990).  The regulations issued in 1967 establish USDA has long adhered to the interpretation that issuance and renewal are separate processes, and compliance with AWA standards is not a prerequisite to renewal.  *See* Laboratory Animal Welfare, 32 Fed. Reg. 3720 (Feb. 24, 1967) (differentiating between issuance and renewal of licenses).  USDA is therefore entitled to significant deference in interpreting the meaning of §§ 2.1(c)(2) and 2.3(a) within the AWA regulatory framework.

As USDA explains, § 2.1(c)(2) is a payment timing provision; the regulation specifies the moment in time at which an applicant satisfies the licensing requirements after submitting his or her fee.  Prior to 2004, § 2.1(c)(2) did not mention renewal and required the application fee to "clear[] normal banking procedures."  *See* Animal Welfare, 54 Fed. Reg. 36123-01, 36148 (Aug. 31, 1989).  Responding to comments from the public, in 2004 USDA eliminated the

33

requirement for bank clearance and instead imposed a penalty for bounced checks. *Animal Welfare, Inspection, Licensing, and Procurement of Animals*, 69 Fed. Reg. 42089-01, 42091 (July 14, 2004). To accomplish this objective, USDA added a new clause mentioning "license renewal" to clarify the bank clearance requirement no longer applied to either initial or renewal licenses. *See id.* Viewed this way, USDA's interpretation of § 2.1(c)(2) is reasonable. This is especially so when there is no indication in the rulemaking record USDA intended, through this minor amendment, to reverse its four-decade long policy of distinguishing between license issuance and renewal. *Cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468, 121 S. Ct. 903, 909–10 (2001) (a lawmaking entity "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes").

Additionally, USDA proffers that § 2.3(a) does not condition license renewal on demonstrated compliance with AWA standards. Rather, § 2.3(a) affirms that initial and renewal applicants have an ongoing legal duty to maintain compliance and submit to random inspections. Violation of this duty can result in enforcement proceedings. We find this to be a plausible interpretation of § 2.3(a). Subsection (b), unlike subsection (a), applies only to initial applicants and requires a demonstration of compliance "before [USDA] will issue a license." USDA's credible interpretation of § 2.3(a) is supported by the rulemaking record. During

34

its 1989 notice-and-comment rulemaking, USDA deleted the phrase "before a license will be issued" from a proposed 1987 rule to illuminate that renewal is not conditioned on prior demonstrated compliance. *See* Animal Welfare Regulations, 54 Fed. Reg. 10835-01, 10840 (proposed Mar. 15, 1989).

While USDA deserves no plaudits for its regulatory draftsmanship, the two regulatory subsections cited by ALDF fail to render USDA's license renewal interpretation "plainly erroneous or inconsistent," *Bowles*, 35 U.S. at 414, 65 S. Ct. at 1217. USDA's explanations of these provisions' intended meaning and relationship to the whole regulatory framework are imminently reasonable. These regulations thus do not render USDA's interpretation of 7 U.S.C. § 2133 a mere post hoc litigation position.

### b. *Reasonableness of agency interpretation*

Having found USDA's interpretation of the AWA license renewal scheme is entitled to deference, we turn to whether that interpretation is reasonable under *Chevron* Step Two. We conclude USDA's interpretation—which does not condition renewal on compliance with animal welfare standards on the anniversary of the license issuance date—is a reasonable one. The USDA's renewal scheme is a sensible policy choice that balances the competing demands of due process and animal welfare.

USDA's administrative renewal process requires a licensee to submit an application fulfilling three requirements: (1) a certification "that, to the best of applicant's knowledge and belief, he or she is in compliance with the regulations and standards and agrees to continue to comply with the regulations and standards," 9 C.F.R. § 2.2(b); (2) payment of an annual fee, *id.* § 2.6(c); and (3) submission of an annual report, *id.* § 2.7(d).[11]  *See* Rules and Regulations, Department of Agriculture, Animal Welfare; Licensing and Records, 60 Fed. Reg. 13893-01, 13894 (Mar. 15, 1995) (creating three renewal requirements). Compliance with AWA standards is not a condition precedent for renewal. *Compare* 9 C.F.R. § 2.2(b) (stating USDA "will renew" a license after fulfilling administrative requirements), *with id.* § 2.3(b) (stating applicant for "initial license" shall "demonstrate compliance with regulations and standards . . . before [USDA] will issue a license").  After obtaining an initial license, licensees are subject to random inspections, *id.* § 2.3, and USDA may bring enforcement proceedings to suspend or revoke a license, *id.* § 2.5; 7 U.S.C. § 2149.

USDA's construction of the AWA's license renewal process was "a reasonable policy choice for the agency to make." *Chevron*, 467 U.S. at 845, 104 S. Ct. at 2783.  USDA's administrative renewal scheme furthers the AWA's

---

[11] As an exhibitor, Seaquarium's annual reports must "set forth in his or her license renewal application and annual report the number of animals owned, held, or exhibited by him or her, including those which are leased, during the previous year or at the time he signs and dates the report, whichever is greater."  9 C.F.R. § 2.7(d).

36

competing goals of promoting animal welfare and affording due process to licensees.  Purely administrative renewal keeps USDA's records up-to-date, and then allows the agency to protect animal welfare through random, unannounced inspections.  Given its limited resources, USDA could not annually inspect the facilities of every zoo, aquarium or other exhibitor across the country,[12] or initiate license termination proceedings for every violation, no matter how minor.  USDA has exercised its "broad discretion to choose how best to marshal its limited resources and personnel to carry out its delegated responsibilities."  *See Massachusetts v. EPA*, 549 U.S. 497, 527, 127 S. Ct. 1438, 1459 (2007).  At the same time, the exclusive use of enforcement proceedings to suspend or revoke licenses for noncompliance fosters Congress's intent to protect licensees from arbitrary agency action, as codified at 7 U.S.C. § 2149.  USDA's interpretation restrains the agency from using the renewal process as a means to bypass licensees' right to notice, a hearing, and an appeal.

ALDF also claims the renewal process is unreasonable because, according to the agency's regulations, USDA is obligated to renew a license even if USDA knows the licensee is failing to comply with the AWA standards.  USDA's "rubber-stamping" licensing scheme thus allegedly sanctions animal abuse in

---

[12] As of 2004, USDA regulated over 2,500 exhibitors possessing AWA licenses.  Animal Welfare, Inspection, Licensing, and Procurement of Animals, 69 Fed. Reg. 42089-01, 42099 (July 14, 2004).

direct contravention of congressional intent.

ALDF overlooks that, after granting a license renewal, USDA retains the authority under its regulations to suspend or revoke a license for noncompliance. Indeed, according to USDA's experience administering the AWA, revoking a license for a minor infraction does not always promote maximum animal welfare. Animal Welfare, Inspection, Licensing, and Procurement of Animals, 69 Fed. Reg. 42089-01, 42094 (July 14, 2004). Due to the threat of USDA enforcement and the imposition of sanctions less severe than revocation, exhibitors are incentivized to rectify violations within a short time window. *See id.* According to the USDA, this brand of cooperative enforcement "has been more effective than enforcement actions for each citation." *Id.* Since USDA issues numerous citations to exhibitors for minor violations that do not directly or immediately impact animal welfare, it is "unrealistic and counterproductive" to risk the stressful release or transfer or animals by making license renewal contingent on demonstrated compliance. *See id.*

The AWA licensing regulations embody a reasonable accommodation of the conflicting policy interests Congress has delegated to the USDA. The regulations

are entitled to *Chevron* deference, and USDA therefore did not act arbitrarily or

capriciously by renewing Seaquarium's license.[13]

## IV.  CONCLUSION

Administration of the AWA standards involves a subject matter that is

"technical, complex, and dynamic."  *Nat'l Cable & Telecomms. Ass'n v. Gulf*

---

[13]  ALDF raises one additional issue.  ALDF argues the district court erred in failing to require production of the administrative record to determine whether USDA's decision to renew the April 2012 license was "arbitrary, capricious, [or] an abuse of discretion."  5 U.S.C. § 706(2)(A).  ALDF contends Goldentyer's letter shows USDA granted the April 2012 license renewal because it found Seaquarium's facilities complied with AWA standards.  Assuming the agency was not required to ensure Seaquarium's compliance with AWA standards before renewing the license, USDA's finding that Seaquarium was in compliance should, ALDF urges, still be reviewed upon remand to the district court.  Under the *Chenery* doctrine, "[w]hen an administrative decision is based on inadequate or improper grounds, a reviewing court may not presume that the [agency] would have made the same decision on other, valid grounds."  *Am. Pub. Transit Ass'n v. Lewis*, 655 F.2d 1272, 1278 (D.C. Cir. 1981); s*ee SEC v. Chenery Corp. (II)*, 332 U.S. 194, 196, 67 S. Ct. 1575, 1577 (1947); *SEC v. Chenery Corp. (I)*, 318 U.S. 80, 88, 63 S. Ct. 454, 459 (1943).

There is no need to remand this case to the district court for additional fact finding because the agency's alleged error was harmless.  An agency decision is harmless "when a mistake of the administrative body is one that clearly had no bearing on the procedure used or the substance of decision reached."  *U.S. Steel Corp. v. EPA*, 595 F.2d 207, 215 (5th Cir. 1979) (quotation omitted) (binding authority because in *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981); *see* 5 U.S.C. § 706 (when reviewing agency action "due account shall be taken of the rule of prejudicial error").

ALDF has conceded Seaquarium fulfilled the only three licensing renewal criteria required by law: (1) filing a certification of compliance, (2) paying a fee, (3) and submitting an annual report.  Because there is no factual dispute about whether USDA correctly found Seaquarium satisfied all licensing requirements, the district court had no reason to examine the administrative record.  Directing the district court to scrutinize the administrative record to evaluate whether USDA complied with a fictitious legal requirement would be the height of pointlessness.  *Salt River Project Agric. Improvement & Power Dist. v. United States*, 762 F.2d 1053, 1060, n.8 (D.C. Cir. 1985) ("When it is clear that based on the valid findings the agency would have reached the same ultimate result, we do not improperly invade the administrative province by affirming.").

*Power Co.*, 534 U.S. 327, 339, 122 S. Ct. 782, 789 (2002). Tasked by Congress to perform the difficult job of reconciling the inherently conflicting interests of due process and animal welfare, USDA has exercised its expertise to craft a reasonable license renewal scheme based on a permissible construction of the AWA. USDA has acted within the bounds of Congress's delegated authority.

As long as USDA refuses to initiate a discretionary enforcement proceeding, the remedy ALDF and Lolita's legion of supporters seek lies not in the federal courts, but in the halls of Congress. Our democratically elected leaders alone have the authority to limit USDA's license-renewal discretion in this matter and to demand annual, substantive compliance with animal welfare standards. While we are sensitive to the plight of Lolita and other animals exhibited across this country, we cannot say USDA violated the AWA by renewing Seaquarium's license through its purely administrative scheme. For the foregoing reasons, we must affirm the district court's grant of summary judgment to USDA.

**AFFIRMED.**

40