*704 Justice Souter
delivered the opinion of the Court.
The question is whether an employer necessarily violates the Pregnancy Discrimination Act (PDA), 42 U. S. C. §2000e(k), when it pays pension benefits calculated in part under an accrual rule, applied only prior to the PDA, that gave less retirement credit for pregnancy leave than for medical leave generally. We hold there is no necessary violation; and the benefit calculation rule in this case is part of a bona fide seniority system under § 703(h) of Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2QQ0e-2(h), which insulates it from challenge.
I
Since 1914, AT&T Corporation (then American Telephone & Telegraph Company) and its Bell System Operating Companies, including Pacific Telephone and Telegraph Company (hereinafter, collectively, AT&T),[1] have provided pensions and other benefits based on a seniority system that relies upon an employee’s term of employment, understood *705 as the period of service at the company minus uncredited leave time.[2]
In the 1960s and early to mid-1970s, AT&T employees on “disability” leave got full service credit for the entire periods of absence, but those who took “personal” leaves of absence received maximum service credit of 30 days. Leave for pregnancy was treated as personal, not disability. AT&T altered this practice in 1977 by adopting its Maternity Payment Plan (MPP), entitling pregnant employees to disability benefits and service credit for up to six weeks of leave. If the absence went beyond six weeks, however, it was treated as personal leave, with no further benefits or credit, whereas employees out on disability unrelated to pregnancy continued to receive full service credit for the duration of absence. This differential treatment of pregnancy leave, under both the pre-1977 plan and the MPP, was lawful: in General Elec. Co. v. Gilbert, 429 U. S. 125 (1976), this Court concluded that a disability-benefits plan excluding disabilities related to pregnancy was not sex-based discrimination within the meaning of Title VII of the Civil Rights Act of 1964, 78 Stat. 253, as amended, 42 U. S. C. § 2000e et seq.
In 1978, Congress amended Title VII by passing the PDA, 92 Stat. 2076, 42 U. S. C. § 2000e(k), which superseded Gilbert so as to make it “clear that it is discriminatory to treat pregnancy-related conditions less favorably than other medical conditions.” Newport News Shipbuilding & Dry Dock Co. v. EEOC, 462 U. S. 669, 684 (1983). On April 29, 1979, the effective date of the PDA, AT&T adopted its Anticipated Disability Plan which replaced the MPP and provided service credit for pregnancy leave on the same basis as leave taken for other temporary disabilities. AT&T did not, however, *706 make any retroactive adjustments to the service credit calculations of women who had been subject to the pre-PDA personnel policies.
Pour of those women are named respondents in this case. Each of them received less service credit for pregnancy leave than she would have accrued on the same leave for disability: seven months less for Noreen Hulteen; about six months for Eleanora Collet; and about two for Elizabeth Snyder and Linda Porter. Respondents Hulteen, Collet, and Snyder have retired from AT&T; respondent Porter has yet to. If her total term of employment had not been decreased due to her pregnancy leave, each would be entitled to a greater pension benefit.
Eventually, each of the individual respondents and respondent Communications Workers of America (CWA), the collective-bargaining representative for the majority of AT&T’s nonmanagement employees, filed charges of discrimination with the Equal Employment Opportunity Commission (EEOC), alleging discrimination on the basis of sex and pregnancy in violation of Title VII. In 1998, the EEOC issued a Letter of Determination finding reasonable cause to believe that AT&T had discriminated against respondent Hulteen and “a class of other similarly-situated female employees whose adjusted [commencement of service] date has been used to determine eligibility for a service or disability pension, the amount of pension benefits, and eligibility for certain other benefits and programs, including early retirement offerings.” App. 54-55. The EEOC issued a notice of right to sue to each named respondent and the CWA (collectively, Hulteen), and Hulteen filed suit in the United States District Court for the Northern District of California.
On dueling motions for summary judgment, the District Court held itself bound by a prior Ninth Circuit decision, Pallas v. Pacific Bell, 940 F. 2d 1324 (1991), which found a Title VII violation where post-PDA retirement eligibility calculations incorporated pre-PDA accrual rules that differ *707 entiated on the basis of pregnancy. See App. to Pet. for Cert. 121a-122a. The Circuit, en bane, affirmed and held that Pallas’s conclusion that “calculation of service credit excluding time spent on pregnancy leave violates Title VII was, and is, correct.” 498 F. 3d 1001, 1003 (2007).
The Ninth Circuit’s decision directly conflicts with the holdings of the Sixth and Seventh Circuits that reliance on a pre-PDA differential accrual rule to determine pension benefits does not constitute a current violation of Title VII. See Ameritech Benefit Plan Comm. v. Communication Workers of Am., 220 F. 3d 814 (CA7 2000) (finding no actionable Title VII violation given the existence of a bona fide seniority system); Leffman v. Sprint Corp., 481 F. 3d 428 (CA6 2007) (characterizing claim as challenging the continuing effects of past discrimination rather than alleging a current Title VII violation). We granted certiorari in order to resolve this split, 554 U. S. 916 (2008), and now reverse the judgment of the Ninth Circuit.
II
Title VII makes it an “unlawful employment practice” for an employer “to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual’s . . . sex.” 42 U. S. C. §2000e-2(a)(l). Generally, a claim under Title VII must be filed “within one hundred and eighty days after the alleged unlawful employment practice occurred,” §2000e-5(e)(1). In this case, Hulteen has identified the challenged practice as applying the terms of AT&T’s seniority system to calculate and pay pension benefits to women who took pregnancy leaves before April 29, 1979. She says the claim is timely because the old service credit differential for pregnancy leave was carried forward through the system’s calculations so as to produce an effect in the amount of the benefit when payments began.
There is no question that the payment of pension benefits in this case is a function of a seniority system, given the fact *708 that calculating benefits under the pension plan depends in part on an employee’s term of employment. As we have said, “[a] ‘seniority system’ is a scheme that, alone or in tandem with non-‘seniority’ criteria, allots to employees ever improving employment rights and benefits as their relative lengths of pertinent employment increase.” California Brewers Assn. v. Bryant, 444 U. S. 598, 605-606 (1980) (footnote omitted). Hulteen is also undoubtedly correct that AT&T’s personnel policies affecting the calculation of any employee’s start date should be considered “ancillary rules” and elements of the system, necessary for it to operate at all, being rules that “define which passages of time will ‘count’ towards the accrual of seniority and which will not.” Id., at 607.
But contrary to Hulteen’s position, establishing the continuity of a seniority system whose results depend in part on obsolete rules entailing disadvantage to once-pregnant employees does not resolve this case. Although adopting a service credit rule unfavorable to those out on pregnancy leave would violate Title VII today, a seniority system does not necessarily violate the statute when it gives current effect to such rules that operated before the PDA. “[S]eniority systems are afforded special treatment under Title VII,” Trans World Airlines, Inc. v. Hardison, 432 U. S. 63, 81 (1977), reflecting Congress’s understanding that their stability is valuable in its own right. Hence, § 703(h): *709 Benefit differentials produced by a bona fide seniority-based pension plan are permitted unless they are “the result of an intention to discriminate.” Ibid.[3]
*708 “Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority . . . system . . . provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin . . . .” 42 U. S. C. §2000e-2(h).
*709 In Teamsters v. United States, 431 U. S. 324 (1977), advantages of a seniority system flowed disproportionately to white, as against minority, employees, because of an employer’s prior discrimination in job assignments. We recognized that this “disproportionate distribution of advantages does in a very real sense operate to freeze the status quo of prior *710 discriminatory employment practices[, b]ut both the literal terms of § 703(h) and the legislative history of Title VII demonstrate that Congress considered this very effect of many seniority systems and extended a measure of immunity to them.” Id., at 350 (internal quotation marks omitted). “[T]he unmistakable purpose of § 703(h) was to make clear that the routine application of a bona fide seniority system would not be unlawful under Title VII.” Id., at 352. The seniority system in Teamsters exemplified a bona fide system without any discriminatory terms (the discrimination having occurred in executive action hiring employees and assigning jobs), so that the Court could conclude that the system “did not have its genesis in ... discrimination, and ... has been maintained free from any illegal purpose.” Id., at 356.
AT&T’s system must also be viewed as bona fide, that is, as a system that has no discriminatory terms, with the consequence that subsection (h) controls the result here, just as in Teamsters. It is true that in this case the pre-April 29, 1979, rule of differential treatment was an element of the seniority system itself; but it did not taint the system under the terms of subsection (h), because this Court held in Gilbert that an accrual rule limiting the seniority credit for time taken for pregnancy leave did not unlawfully discriminate on the basis of sex. As a matter of law, at that time, “an exclusion of pregnancy from a disability-benefits plan providing general coverage [was] not a gender-based discrimination at all.” 429 U. S., at 136.[4] Although the PDA would have *711 made it discriminatory to continue the accrual policies of the old rule, AT&T amended that rule as of the effective date of the Act, April 29,1979; the new one, treating pregnancy and other temporary disabilities the same way, remains a part of AT&T’s seniority system today.
This account of litigation, legislation, and the evolution of the system’s terms is the answer to Hulteen’s argument that Teamsters supports her position. She correctly points out that a “seniority system that perpetuates the effects of preAct discrimination cannot be bona fide if an intent to discriminate entered into its very adoption,” 431 U. S., at 346, n. 28, and she would characterize AT&T’s seniority system as intentionally discriminatory, on the theory that the accrual rule for pregnancy leave was facially discriminatory from the start. She claims further support from Automobile Workers v. Johnson Controls, Inc., 499 U. S. 187 (1991), in which we said that “explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination,” and that such facial discrimination is intentional discrimination even if not based on any underlying malevolence. Id., at 199. Hulteen accordingly claims that the superseded differential affecting current benefits was, and remains, “discriminatory in precisely the way the PDA prohibits,” Brief for Respondents 18.
But Automobile Workers is not on point. The policy in that case, prohibiting women from working in jobs with lead exposure unless they could show themselves incapable of childbearing, was put in place after the PDA became law and under its terms was facially discriminatory. In this case, however, AT&T’s intent when it adopted the pregnancy leave rule (before the PDA) was to give differential treat *712 ment that as a matter of law, as Gilbert held, was not gender-based discrimination. Because AT&T’s differential accrual rule was therefore a permissible differentiation given the law at the time, there was nothing in the seniority system at odds with the subsection (h) bona fide requirement. The consequence is that subsection (h) is as applicable here as it was in Teamsters, and the calculations of credited service that determine pensions are the results of a permissibly different standard under subsection (h) today.[5]
The only way to conclude here that the subsection would not support the application of AT&T’s system would be to read the PDA as applying retroactively to recharacterize the acts as having been illegal when done, contra Gilbert.[6] But this is not a serious possibility. As we have said:
“Because it accords with widely held intuitions about how statutes ordinarily operate, a presumption against retroactivity will generally coincide with legislative and public expectations. Requiring clear intent assures that Congress itself has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay for the eoun *713 tervailing benefits.” Landgraf v. USI Film Products, 511 U. S. 244, 272-273 (1994).
There is no such clear intent here, indeed, no indication at all that Congress had retroactive application in mind; the evidence points the other way. Congress provided for the PDA to take effect on the date of enactment, except in its application to certain benefit programs, as to which effectiveness was held back 180 days. Act of Oct. 31, 1978, §2(b), 92 Stat. 2076, note following 42 U. S. C. §2000e(k) (1976 ed., Supp. III). The House Report adverted to these benefit schemes:
“As the Gilbert decision permits employers to exclude pregnancy-related coverage from employee benefit plans, [the bill] provides for [a] transition period of 180 days to allow employees [sic] to comply with the explicit provisions of this amendment. It is the committee’s intention to provide for an orderly and equitable transition, with the least disruption for employers and employees, consistent with the purposes of the bill.” H. R. Rep. No. 95-948, p. 8 (1978).
This is the language of prospective intent, not retrospective revision.
Hulteen argues that she nonetheless has a challenge to AT&T’s current payment of pension benefits under § 706(e)(2) of Title VII, believing (again mistakenly) that this subsection affects the validity of any arrangement predating the PDA that would be facially discriminatory if instituted today. Brief for Respondents 27-29. Section 706(e)(2) provides that
“an unlawful employment practice occurs, with respect to a seniority system that has been adopted for an intentionally discriminatory purpose in violation of this sub-chapter (whether or not that discriminatory purpose is apparent on the face of the seniority provision), when *714 the seniority system is adopted, when an individual becomes subject to the seniority system, or when a person aggrieved is injured by the application of the seniority system or provision of the system.” 42 U. S. C. § 2000e-5(e)(2).
But, as the text makes clear, this subsection determines the moments at which a seniority system violates Title VII only if it is a system “adopted for an intentionally discriminatory purpose in violation of this subchapter.” As discussed above, the Court has unquestionably held that the feature of AT&T’s seniority system at issue was not discriminatory when adopted, let alone intentionally so in violation of this subchapter. That leaves § 706(e)(2) without any application here.
It is equally unsound for Hulteen to argue that when she retired AT&T could have chosen to give post-PDA credit to pre-PDA pregnancy leave, making its failure to do so facially discriminatory at that time.[7] If a choice to rely on a favorable statute turned every past differentiation into contemporary discrimination, subsection (h) would never apply.
Hulteen’s remaining argument (as of the time the case was submitted to us) is that our decision in Bazemore v. Friday, 478 U. S. 385 (1986) (per curiam), is on her side. In Bazemore, black employees of the North Carolina Agricultural Extension Service, who received less pay than comparable whites under a differential compensation plan extending back to pre-Title VII segregation, brought suit in 1971 claiming that pay disparities persisted. Id., at 389-391 (Brennan, J., concurring in part). We concluded that “[a] pattern or practice that would have constituted a violation of Title VII, but for the fact that the statute had not yet become effective, *715 became a violation upon Title VIPs effective date, and to the extent an employer continued to engage in that act or practice, it is liable under that statute.” Id., at 395.
Bazemore has nothing to say here. To begin with, it did not involve a seniority system subject to subsection (h); rather, the employer in Bazemore had a racially based pay structure under which black employees were paid less than white employees. Further, after Title VII became law, the employer failed to eliminate the discriminatory practice, even though the new statute had turned what once was legally permissible into something unlawful. Bazemore would be on point only if, after the PDA, AT&T continued to apply an unfavorable credit differential for pregnancy leave simply because it had begun to do that before the PDA. AT&T’s system, by contrast, provides future benefits based on past, completed events, that were entirely lawful at the time they occurred.
Ill
We have accepted supplemental briefing after the argument on the possible effect on this case of the recent amendment to § 706(e) of Title VII, adopted in response to Ledbetter v. Goodyear Tire & Rubber Co., 550 U. S. 618 (2007), and dealing specifically with discrimination in compensation: *716 Hulteen argues that payment of the pension benefits at issue in this case marks the moment at which she “is affected by application of a discriminatory compensation decision or other practice,” and she reads the statute as providing that such a “decision or other practice” may not be applied to her disadvantage.
*715 “For purposes of this section, an unlawful employment practice occurs, with respect to discrimination in compensation in violation of this title, when a discriminatory compensation decision or other practice is adopted, when an individual becomes subject to a discriminatory compensation decision or other practice, or when an individual is affected by application of a discriminatory compensation decision or other practice, including each time wages, benefits, or other compensation is paid, resulting in whole or in part from such a decision or other practice.” Lilly Ledbetter Fair Pay Act of 2009, Pub. L. 111-2, §3,123 Stat. 5-6.
*716 But the answer to this claim is essentially the same as the answer to Hulteen’s argument that § 706(e)(2) helps her, supra, at 713-714. For the reasons already discussed, AT&T’s pre-PDA decision not to award Hulteen service credit for pregnancy leave was not discriminatory, with the consequence that Hulteen has not been “affected by application of a discriminatory compensation decision or other practice.” §3, 123 Stat. 6.
IV
Bona fide seniority systems allow, among other things, for predictable financial consequences, both for the employer who pays the bill and for the employee who gets the benefit. Cf. Central Laborers’ Pension Fund v. Heinz, 541 U. S. 739, 743 (2004) (noting that the central feature of the Employee Retirement Income Security Act of 1974, 29 U. S. C. § 1001 et seq., is its “object of protecting employees’ justified expectations of receiving the benefits their employers promise them”). As § 703(h) demonstrates, Congress recognized the salience of these reliance interests and, where not based upon or resulting from an intention to discriminate, gave them protection. Because the seniority system run by AT&T is bona fide, the judgment of the Court of Appeals for the Ninth Circuit is reversed.

It is so ordered.

 In 1982, a consent decree and modified final judgment (MFJ) were entered to resolve the Government’s antitrust suit against American Telephone & Telegraph Company. The MFJ resulted in the breakup of American Telephone & Telegraph and the divestiture of the local Bell System Operating Companies, including Pacific Telephone and Telegraph Company (PT&T). Many employees of the former Bell System Operating Companies became employees of the new AT&T Corporation. The Plan of Reorganization, approved by the United States District Court for the District of Columbia, United States v. Western Elec. Co., 569 F. Supp. 1057, aff’d sub nom. California v. United States, 464 U. S. 1013 (1983), provided that “all employees will carry with them all pre-divestiture Bell System service regardless of the organizational unit or corporation by which they are employed immediately after divestiture.” App. 54. Respondents in this case were employed at PT&T. After the divestiture of the Bell Operating Companies in 1984, these women became employees of AT&T Corporation and their service calculations, as computed by PT&T under its accrual rules, were carried over to AT&T Corporation.

 AT&T’s calculation of a term of employment is a more complicated endeavor, requiring the creation and maintenance of an individual “start date” for each employee, which is adjusted based on the relevant leave policy.

 Section 701(k) of Title VII provides that “women affected by pregnancy . . . shall be treated the same for all employment-related purposes, including receipt of benefits under fringe benefit programs, as other persons not so affected but similar in their ability or inability to work, and nothing in section [703(h)] of this title shall be interpreted to permit otherwise.” 42 U. S. C. §2000e(k). Hulteen contends that, in light of this language, § 703(h) does not apply at all to claims of fringe-benefit discrimination under the PDA. We cannot agree. Hulteen’s reading would result in the odd scenario that pregnancy discrimination, alone among all categories of discrimination (race, color, religion, other sex-based claims, and national origin), would receive dispensation from the general application of subsection (h).
A better explanation is that § 701(k) refers only to the final sentence of § 703(h), which reads that “[i]t shall not be an unlawful employment practice under this subehapter for any employer to differentiate upon the basis of sex in determining the amount of the wages or compensation paid or to be paid to employees of such employer if such differentiation is authorized by the provisions of section 206(d) of title 29.” 42 U. S. C. § 2000e-2(h). This final sentence of subsection (h), referred to as the Bennett Amendment, served to reconcile the Equal Pay Act of 1963,77 Stat. 56,29 U. S. C. § 206(d), with Title VII. See County of Washington v. Gunther, 452 U. S. 161, 194 (1981) (Rehnquist, J., dissenting). In General Elec. Co. v. Gilbert, 429 U. S. 125 (1976), this Court had concluded that the amendment permitted wage discrimination based on pregnancy. Id., at 144-145. By adding the language, “nothing in section [703(h)] of this title shall be interpreted to permit otherwise,” to the PDA, 42 U. S. C. §2000e(k), Congress wanted to ensure that, in addition to replacing Gilbert with a rule that discrimination on the basis of pregnancy is sex discrimination, it foreclosed the possibility that this Court’s interpretation of the Bennett Amendment could be construed, going forward, to permit wage discrimination based on pregnancy.

 Gilbert recognized that differential treatment could still represent intentionally discriminatory treatment if pretextual, 429 U. S., at 136, and that a forbidden discriminatory effect could result if a disability-benefits plan produced overall preferential treatment for one sex, id,., at 138. Neither theory is advanced here.
In Nashville Gas Co. v. Satty, 434 U. S. 136 (1977), we reaffirmed our holding in Gilbert that Title VII “did not require that greater economic benefits be paid to one sex or the other ‘because of their differing roles in “the scheme of human existence.’”” Id., at 142 (quoting Gilbert, supra, at 139, n. 17). But we noted that Gilberts holding did not extend to “per *711 mit an employer to burden female employees in such a way as to deprive them of employment opportunities because of their different role.” Satty, supra, at 142. Cancellation of benefits previously accrued, therefore, was considered facially violative at the time, but such a situation is not presented here.

 Although certain Courts of Appeals had previously concluded that treating pregnancy leave less favorably than other disability leave constituted sex discrimination under Title VII, this Court in Gilbert clearly rejected that conclusion, 429 U. S., at 147 (Brennan, J., dissenting); see also id., at 162 (Stevens, J., dissenting). Gilbert declared the meaning and scope of sex discrimination under Title VII and held that previous views to the contrary were wrong as a matter of law. And “[a] judicial construction of a statute is an authoritative statement of what the statute meant before as well as after the decision of the case giving rise to that construction.” Rivers v. Roadway Express, Inc., 511 U. S. 298, 312-313 (1994); see also id., at 313, n. 12. It is therefore to no avail to argue that the pregnancy leave cap was unlawful before Gilbert and that the PDA returned the law to its prior state.

 In so saying, we assume that § 701(k) has no application, as explained in footnote 3, supra. Cf. post, at 720-721 (Ginsburg, J., dissenting).

 To the extent Hulteen means to claim, as a factual matter, that the accrual rule was merely advisory, requiring a fresh choice to apply it in the benefit context, she points to nothing in the record supporting such a proposition.