Danielle Rahilly CONLEY, Plaintiff,

v.

## NORTHWEST FLORIDA STATE COLLEGE, Defendant.

Case No. 3:14–cv–00628–MCR–EMT

United States District Court, N.D. Florida, **Pensacola Division.**

Signed November 12, 2015

**42.** *Stangl,* 554 P.2d at 1319.

**43.** Docket no. 205.

Travis Robert Hollifield, Winter Park, FL, Adria Lynn Silva, Law Office of Adria Lynn Silva LLC, Naples, FL, for Plaintiff.

Hayward Dykes, Jr., Lamar A. Conerly PA, J. Bruce Bowman, Conerly Bowman & Dykes LLP, Destin, FL, for Defendant.

## ORDER

M. CASEY RODGERS, CHIEF
UNITED STATES DISTRICT JUDGE

Pending before the Court is Defendant Northwest Florida State College's ("NFSC") Motion to Dismiss Plaintiff Danielle Rahilly Conley's sex-discrimination claim under Title IX, 20 U.S.C. § 1681 *et seq.* Having fully considered the matter, the Court finds that the motion is due to be denied.[1]

### Background

Conley alleges the following facts in her Complaint. Conley became pregnant in early 2012 while enrolled as a student in NFSC's paramedic program for the 2012–2013 school year. As part of the program, Conley was required to participate in an off-campus clinical rotation for academic credit. NFSC placed her with Okaloosa County Emergency Medical Services ("OCEMS"), where she was already employed as an emergency medical services technician or "EMT." In October of 2012, Conley informed OCEMS that she was pregnant and inquired about her rights under the Family and Medical Leave Act. OCEMS informed NFSC about Conley's

---

1. Also pending before the Court is NFSC's Motion for Leave to File a Reply Memorandum in Support of its Motion to Dismiss. Local Rule 7.1(C)(2) provides that "[n]o reply memoranda shall be filed absent a showing of good cause." The Court finds good cause for additional briefing based on the complex nature of the legal issue presented in this case. Therefore, NFSC's Motion is granted and its reply has been considered.

pregnancy, and NFSC responded by requiring Conley to provide medical documentation that she was able to participate in the clinical portion of her education program. NFSC did not, however, require other students who were under the treatment of a doctor for a physical or emotional condition to provide additional documentation beyond the initial health certification required of all students participating in off-campus clinical rotations. Nevertheless, on November 8, 2012, Conley provided NFSC with a doctor's note stating she was fit to participate in the program. Two days later, however, Conley was admitted to the hospital for Braxton–Hicks or "false labor" contractions. The following day, Conley was discharged from the hospital and placed on bed rest for three days. She provided the discharge papers to OCEMS. On November 13, 2012, OCEMS Chief Al Herndon informed NFSC by email that Conley would not be allowed to participate in the clinical rotation due to potential liability regarding her unborn child. The next day, NFSC dismissed Conley from her clinical rotation and gave her an "incomplete" for the course.

On November 14, 2012, Conley was placed on bed rest for the remainder of her pregnancy, and she provided a note to OCEMS to that effect so she could be placed on relief status for that time. NFSC also received a copy of the note and advised Conley that with a doctor's release and the approval of OCEMS, she could complete her clinical rotation the week before the spring semester was to begin. Again, NFSC did not require other students under a doctor's care to provide the same type of approval.

On December 15, 2012, Conley inquired about taking the final exam she missed due to the birth of her daughter. On January 3, 2013, she was released by her doctor to return to school and the clinical rotation. The next day, Barry Reed, who was in charge of NFSC's paramedic program, emailed Conley and informed her that if she took her final exam and completed her clinical rotation, she could be reinstated before the start of the spring semester. On January 6, 2013, Larry Skeete, a representative of NFSC, refused to reinstate Conley to the status she had before her maternity leave began and refused to let her take the final exam or finish her clinical rotation before the start of the spring semester.[2] Skeete told Conley that if she knew she was pregnant, she could have taken extra clinical rotations to get them out of the way.

According to Conley, on January 9, 2013, without first obtaining a release or permission from her, NFSC contacted her OB/GYN in order to persuade the doctor to revoke her release to return to the clinical portion of her school program. Thereafter, NFSC Dean Sasha Jarrell informed Conley by email that she would never have been admitted into the paramedic program if NFSC had known she was pregnant. Further, Conley alleges that after she complained to NFSC about discrimination, NFSC President Ty Handy emailed her to admonish her for taking risks with her condition, saying that the courts would agree she "messed in her nest" and now wanted the college to bail her out.[3]

On November 17, 2014, Conley filed the instant sex-discrimination claim pursuant

2. The record does not reflect Skeete's title.

3. Conley's complaint states that in April 2014, NFSC entered into a settlement with the United States Department of Education Office for Civil Rights and agreed it would change its policies and procedures regarding pregnancy discrimination complaints. Though the Department of Education's action was spurred by Conley's charge of discrimination, Conley was not a party to the settlement.

to Title IX, 20 U.S.C. § 1681 *et seq.*, which NFSC has moved to dismiss.

### Standard of Review

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). The Court construes all factual allegations in the complaint in the light most favorable to the plaintiff. *See Lanfear v. Home Depot, Inc.,* 679 F.3d 1267, 1275 (11th Cir.2012).

### Discussion

■ In its motion to dismiss, NFSC argues that there is no private right of action for pregnancy discrimination under Title IX, 20 U.S.C. § 1681. Conley argues in response that § 1681's prohibition of discrimination "on the basis of sex" is broad enough to encompass pregnancy-based discrimination. She relies in part on a Department of Education Regulation 34 C.F.R. § 106.40 that construes § 1681's prohibition of discrimination "on the basis of sex" to include pregnancy-based discrimination. The Court agrees with Conley that Title IX's prohibition of discrimination "on the basis of sex" encompasses pregnancy-based discrimination.

The Court begins its construction of § 1681 with the statute's text.[4] *See Koch Foods, Inc. v. Sec'y, U.S. Dep't of Labor,*

712 F.3d 476, 480 (11th Cir.2013) (quoting *DIRECTV, Inc. v. Brown,* 371 F.3d 814, 817 (11th Cir.2004)); *see also Animal Legal Def. Fund v. U.S. Dep't of Agric.,* 789 F.3d 1206, 1216 (11th Cir.2015); *Harris v. Garner,* 216 F.3d 970, 972 (11th Cir.2000) (en banc). Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[5] 20 U.S.C. § 1681(a). The statute does not define the term "sex." In the absence of a statutory definition of a particular term, courts look to common usage of words for their meaning. *See Koch Foods,* 712 F.3d at 480 (quoting *Jackson v. State Bd. of Pardons and Paroles,* 331 F.3d 790, 795 (11th Cir.2003)) *see also Animal Legal Def.,* 789 F.3d at 1216; *CBS Inc. v. PrimeTime 24 Joint Venture,* 245 F.3d 1217, 1222 (11th Cir.2001). Common usage is often derived from the dictionary. *Koch Foods,* 712 F.3d at 480; *see also Animal Legal Def.,* 789 F.3d at 1216; *Jackson,* 331 F.3d at 795 (11th Cir.2003).

Merriam–Webster defines "sex" as "either of the two major forms of individuals that occur in many species and that are distinguished respectively as female or male esp. on the basis of their reproductive organs and structures" and as "the sum of the structural, functional, and behavioral characteristics of organisms that are involved in productive behavior marked by the union of gametes and that distinguish males and females." *Merriam–Webster's Collegiate Dictionary* 1140 (11th ed.2003).[6] Dictionaries more con-

---

**4.** The Court's initial inquiry focuses on the statute's text, rather than the Department of Education's regulation, because if the meaning of the statute is unambiguous, the Department's interpretation of the statute is immaterial. *See Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

**5.** It is undisputed that NFSC is a covered entity under Title IX.

**6.** *See also Oxford English Dictionary* (3d ed.2008), http://www.oed.com/view/Entry/176989?result=1 & rskey=os68EW & (defining "sex" as "[e]ither of the two main categories (male and female) into which humans

temporaneous to the 1972 enactment of Title IX defined "sex" similarly. *See Webster's Seventh New Collegiate Dictionary* 795 (1967) (defining "sex" as "[e]ither of two divisions of organisms distinguished respectively as male or female" and "[t]he sum of the structural, functional, and behavioral peculiarities of living beings that subserve reproduction by two interacting parents and distinguish males and females"); *Black's Law Dictionary*, 1541 (4th rev. ed.1968) (defining "sex" as "[t]he sum of the peculiarities of structure and function that distinguish a male from a female organism; the character of being male or female"); *cf. also Taniguchi v. Kan Pac. Saipan, Ltd.,* —— U.S. ——, 132 S.Ct. 1997, 2002, 182 L.Ed.2d 903 (2012) (using contemporaneous dictionaries to determine meaning of statutory term). The common thread running through these definitions is a focus on reproduction, including the "structural" and "functional" differences between typical male and female bodies. Thus, at least by virtue of common usage, the meaning of the term "sex" in § 1681 includes pregnancy. *Cf. Glass v. Captain Katanna's, Inc.,* 950 F.Supp.2d 1235, 1245 (M.D.Fla.2013) (using dictionary definition of "sex" to find that plain meaning of sex discrimination in Florida Civil Rights Act encompasses pregnancy discrimination).

. The question of whether a statutory term is ambiguous, however, is not solely a matter of its dictionary definition. *See Animal Legal Def.,* 789 F.3d at 1216. Rather, "[t]he plainness or ambiguity of statutory language is determined [also by] ... the specific context in which that language is used, and the broader context of the statute as a whole," *id.* (quoting *Robin-*

son *v. Shell Oil Co.,* 519 U.S. 337, 341, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)), including its object and policy, *id.* The Supreme Court has spoken to the object and policy of Title IX on several occasions, and has consistently instructed that "to give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language." *N. Haven Bd. of Ed. v. Bell,* 456 U.S. 512, 521, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982) (quoting *United States v. Price,* 383 U.S. 787, 801, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966)); *see also Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 180, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005) (construing Title IX to encompass private action for retaliation, despite no express mention of retaliation in statute); *Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 650, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) (construing Title IX sex-discrimination prohibition to include student-on-student sexual harassment); *Franklin v. Gwinnett Cnty. Pub. Sch.,* 503 U.S. 60, 75, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) (construing Title IX sex-discrimination prohibition to include teacher-on-student sexual harassment); *N. Haven,* 456 U.S. at 521, 102 S.Ct. 1912 (interpreting Title IX to prohibit employment discrimination, despite no express inclusion of term "employee").

Moreover, although the Court need not resort to legislative history when a statute is not ambiguous, the legislative history of Title IX is instructive, because it shows that Congress specifically envisaged that its prohibition of sex discrimination would encompass pregnancy discrimination. *See Animal Legal Def.,* 789 F.3d at 1218 (examining legislative history of unambiguous statute because history was consistent with

and many other living things are divided on the basis of their reproductive functions"); *Collins American English Dictionary* (2015), http://www.collinsdictionary.com/dictionary/american/sex (defining "sex" as "either of the

two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions" and "anything connected with sexual gratification or reproduction").

statute's plain meaning); *Harris v. Garner*, 216 F.3d 970, 977 (11th Cir.2000) (examining legislative history of unambiguous statute where history "supports and complements the plain meaning of [the] statutory language"). On the day Title IX was enacted, floor debates confirmed Congress's broad objective "to root out, as thoroughly as possible at the present time, the social evil of sex discrimination in education." 118 Cong. Rec. 5804 (1972) (remarks of Sen. Bayh). Senator Birch Bayh, the sponsor of Title IX, specifically cited as an example of this "social evil" the fact that on college campuses "[m]any students are denied leave for pregnancy and childbirth." 118 Cong. Rec. 5811. He criticized the logic of those in higher education who would deny a woman admission to graduate school because: " 'If she's NOT married, she'll get married.' 'If she *is* married, then she'll probably have children.' 'If she has children, she can't possibly be committed to study.' 'If her children are older, then she's too old to begin training, and what a pity it is that she didn't start sooner.' " *Id.* And he highlighted the shortage of women in university faculty positions, citing the belief of some in academia that women have a greater rate of absenteeism, despite the fact that the Women's Bureau of the Department of Labor found that "men lose more time off the job because of hernias than do women because of child birth and pregnancy." 118 Cong. Rec. 5810. Senator Bayh's statements—"which were made on the same day the amendment was passed, and some of which were prepared rather than spontaneous remarks—are the only authoritative indications of congressional intent regarding the scope of [Title IX]." [7] *N. Haven,* 456 U.S. at 527, 102 S.Ct. 1912; *see also id.* at 526–27, 102 S.Ct. 1912

(recognizing that "Senator Bayh's remarks, as those of the sponsor of the language ultimately enacted, are an authoritative guide to the statute's construction.").

In light of the legislative history of Title IX, the broad sweep of its language, and the fact that the term "sex" is understood in common usage to encompass pregnancy, the Court finds that Congress's prohibition of discrimination "on the basis of sex" unambiguously includes pregnancy-based discrimination within its purview. *Cf. Delva v. Cont'l Grp., Inc.,* 137 So.3d 371, 375 (Fla.2014) (construing sex discrimination to include pregnancy discrimination in re Florida Civil Rights Act); *Lavalley v. E.B. & A.C. Whiting Co.,* 166 Vt. 205, 692 A.2d 367, 370 (1997) (same in re Vermont's Fair Employment Practices Act); *Colo. Civil Rights Comm'n v. Travelers Ins. Co.,* 759 P.2d 1358, 1364–65 (Colo.1988) (same in re Colorado's Equal Rights Amendment and Discriminatory or Unfair Employment Practices statute); *Midstate Oil Co. v. Mo. Comm'n on Human Rights,* 679 S.W.2d 842, 846 (Mo.1984) (same in re Missouri Human Rights Act); *Minn. Min. & Mfg. Co. v. State,* 289 N.W.2d 396, 399–400 (Minn.1979) (same in re Minnesota Human Rights Act); *Mass. Elec. Co. v. Mass. Comm'n Against Discrimination,* 375 Mass. 160, 375 N.E.2d 1192, 1198 (1978) (same in re Massachusetts employment discrimination statute); *Anderson v. Upper Bucks Cnty. Area Vocational Tech. Sch.,* 30 Pa.Cmwlth. 103, 373 A.2d 126, 130 (1977) (same in re Pennsylvania Human Rights Act); *Brooklyn Union Gas Co. v. N.Y. Human Rights Appeal Bd.,* 41 N.Y.2d 84, 390 N.Y.S.2d 884, 359 N.E.2d 393, 398 (1976) (same in re New York Human Rights Law); *Parr v. Cedar Rap-*

---

7. Because Title IX originated as a floor amendment, no committee report exists. *Id.* at 527, 102 S.Ct. 1912.

*ids Comty. Sch. Dist.*, 227 N.W.2d 486, 496 (Iowa 1975) (same in re Iowa Civil Rights Act); *Ray–O–Vac v. Wis. Dep't of Indus., Labor & Human Relations*, 70 Wis.2d 919, 236 N.W.2d 209, 217 (1975) (same in re Wisconsin Fair Employment Law); *Cerra v. E. Stroudsburg Area Sch. Dist.*, 450 Pa. 207, 299 A.2d 277, 279 (1973) (same in re Pennsylvania Human Rights Act). "If the intent of Congress is clear, that is the end of the matter; for the [C]ourt ... must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842–43, 104 S.Ct. 2778; *see Animal Legal Def.*, 789 F.3d at 1215 (explaining courts "presume that Congress said what it meant and meant what it said (quoting *Harry v. Marchant*, 291 F.3d 767, 770 (11th Cir.2002) (en banc)); *Koch Foods*, 712 F.3d at 480; *Friends of Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1223 (11th Cir.2009).

▪ Alternatively, the Court concludes that even if it finds § 1681 ambiguous in its reference to "sex," Conley's claim survives under a *Chevron* analysis, because the Department of Education's regulation, 34 C.F.R. § 106.40, authoritatively interprets § 1681's prohibition of sex discrimination to include pregnancy discrimination. *See Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843–44, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). According to § 106.40(a), a school receiving federal assistance "shall not apply any rule concerning a student's actual or potential parental, family, or marital status which treats students differently on the basis of sex." Section 106.40(b)(1) provides that a school receiving federal assistance "shall not discriminate against any student, or exclude any student from its education program or activity, including any class or extracurricular activity, on the basis of such student's pregnancy, childbirth, false pregnancy, termination of pregnancy or recovery therefrom." 34 C.F.R. § 106(b)(1); *see also Chipman v. Grant*

*Cnty. Sch. Dist.*, 30 F.Supp.2d 975, 977 (E.D.Ky.1998) ("Regulations promulgated under Title IX unequivocally apply its prohibition against sex discrimination to discrimination on the basis of pregnancy and parental status.").

The Court may give "considerable weight" to an administrative agency's construction or interpretation of a statutory scheme it is entrusted to administer. *Chevron*, 467 U.S. at 844, 104 S.Ct. 2778. It may be apparent from the general authority Congress conferred on an agency, as well as other statutory circumstances, "that Congress would expect the agency to be able to speak with the force of law when it addresses ambiguity in [a] statute or fills a space in [an] enacted law." *United States v. Mead Corp.*, 533 U.S. 218, 229, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001). When circumstances imply that such an expectation exists, a reviewing court generally has "no business" rejecting an agency's resolution of a particular statutory ambiguity. *See id.*; *cf.* 5 U.S.C. § 706(2) (a reviewing court shall set aside agency action, findings, and conclusions found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"). This level of deference to administrative agency interpretation is commonly referred to as *Chevron* deference. *See, e.g., Mead*, 533 U.S. at 230, 121 S.Ct. 2164.

A regulation qualifies for *Chevron* treatment "when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *Mead*, 533 U.S. at 226–27, 121 S.Ct. 2164 (citing *Chevron*, 467 U.S. at 847, 104 S.Ct. 2778); *Mayo Found. for Med. Educ. & Research v. United States*, 562 U.S. 44, 57, 131 S.Ct. 704, 178 L.Ed.2d 588 (2011); *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1178 (11th

Cir.2003). "[A] very good indicator of delegation meriting *Chevron* treatment i[s] express congressional authorization[ ] to engage in [a] process of rulemaking or adjudication that produces regulations or rulings for which deference is claimed." *Mead*, 533 U.S. at 229, 121 S.Ct. 2164; *Mayo*, 562 U.S. at 57, 131 S.Ct. 704. "Thus, the overwhelming number of ... cases applying *Chevron* deference have reviewed the fruits of notice-and-comment rulemaking or formal adjudication."[8] *Mead*, 533 at 230, 121 S.Ct. 2164; *Mayo*, 562 U.S. at 57, 131 S.Ct. 704 (observing *Chevron* treatment is appropriate "[w]here an agency rule sets forth important individual rights and duties, where the agency focuses fully and directly upon the issue, where the agency uses full notice-and-comment procedures to promulgate a rule, [and] where the resulting rule falls within the statutory grant of authority" (alterations in original) (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 173, 127 S.Ct. 2339, 168 L.Ed.2d 54 (2007))).

Congress has expressly delegated to the Department of Education the authority "to effectuate the provisions of section 1681 ... by issuing rules, regulations, or orders of general applicability." 20 U.S.C. § 1682; *see also Davis*, 526 U.S. at 638, 119 S.Ct. 1661 (recognizing agency authority to promulgate regulations to enforce objectives of § 1681); *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 934 (D.C.Cir.2004) (same). The regulation at issue, 34 C.F.R. § 106.40, states that it was promulgated according to the authority delegated by § 1682, and the history of § 106.40 shows it is the product of formal notice-and-comment rulemaking. *See Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance*, 40 Fed.Reg. 24128 (June 4, 1975) (observing formal notice-and-comment rulemaking was employed); 40 Fed.Reg. 24131, 24140, 24142 (June 4, 1975) (construing sex discrimination to include pregnancy discrimination); *cf. generally, Establishment of Title and Chapters*, 45 Fed.Reg. 30802, 30962 (May 9, 1980) (recodifying 1975 Title IX regulations; redesignating pregnancy discrimination regulation as 34 C.F.R. § 106.40). Thus, § 106.40 qualifies for *Chevron* treatment. *See Mead*, 533 U.S. at 229, 121 S.Ct. 2164.

Even under *Chevron*, however, the agency's resolution of an ambiguity in a statute must still be "reasonable." *Michigan v. E.P.A.*, —— U.S. ——, 135 S.Ct. 2699, 2707, 192 L.Ed.2d 674 (2015); *Utility Air Regulatory Group v. EPA*, —— U.S. ——, 134 S.Ct. 2427, 2442, 189 L.Ed.2d 372 (2014)); *Zuni Pub. Sch. Dist. No. 89 v. Dep't of Educ.*, 550 U.S. 81, 89, 127 S.Ct. 1534, 167 L.Ed.2d 449 (2007); *see also Mead*, 533 U.S. at 227, 121 S.Ct. 2164 (observing that regulation meriting *Chevron* treatment "is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute"); *Mayo*, 562 U.S. at

---

**8.** In circumstances where *Chevron* deference is not warranted, a lesser level of deference may be appropriate pursuant to *Skidmore v. Swift & Co.*, 323 U.S. 134, 135, 65 S.Ct. 161, 89 L.Ed. 124 (1944). *See Mead*, 533 U.S. at 234–35, 121 S.Ct. 2164. Under the *Skidmore* standard, an agency's interpretation of a statute may merit "some deference" regardless of the fact that it is not the product of formal notice-and-comment rulemaking, "given the 'specialized experience and broader investigations and information' available to the agency, and ... the value of uniformity in its administrative and judicial understandings of what a national law requires." *Id.* at 234, 121 S.Ct. 2164 (quoting *Skidmore*, 323 U.S. at 139, 65 S.Ct. 161). The level of deference accorded to the interpretation is "proportional to its 'power to persuade,'" *id.* at 235, 121 S.Ct. 2164 (quoting *Skidmore*, 323 U.S. at 140, 65 S.Ct. 161), which is judged by "the merit of its writer's thoroughness, logic, and expertness, its fit with prior interpretations, and any other sources of weight," *id.*

53, 131 S.Ct. 704 (same). Courts may consider a number of factors to determine whether an agency's interpretation is reasonable, including whether the interpretation is consistent with the statute's plain language or meaning, *see N.L.R.B. v. Ky. River Cmty. Care, Inc.,* 532 U.S. 706, 721, 121 S.Ct. 1861, 149 L.Ed.2d 939 (2001), whether the interpretation is consistent with the congressional intent or purpose underlying the statute, *see United States v. Haggar Apparel Co.,* 526 U.S. 380, 392, 119 S.Ct. 1392, 143 L.Ed.2d 480 (1999), and whether Congress was aware of the agency's interpretation and refrained from acting to revise or repeal it, *see Commodity Futures Trading Comm'n v. Schor,* 478 U.S. 833, 845, 106 S.Ct. 3245, 92 L.Ed.2d 675 (1986). *See also, generally,* Kristine Cordier Karnezis, *Construction and Application of "Chevron Deference" to Administrative Action by United States Supreme Court,* 3 A.L.R. Fed. 2d 25, §§ 19–25 (2015) (noting additional factors courts may consider under *Chevron* step two, including, inter alia, age of agency's interpretation).

As the Court has explained supra, the Department of Education's regulation interpreting § 1681's prohibition of discrimination "on the basis of sex" to include pregnancy-based discrimination is consistent with the plain language of the statute, because the meaning of the term "sex" in common usage encompasses pregnancy. *See, e.g., Merriam–Webster's Collegiate Dictionary* 1140 (11th ed.2003). Further, Title IX is to be construed "broadly," *see, e.g., Jackson,* 544 U.S. at 174, 125 S.Ct. 1497, and its legislative history plainly reflects Congress's intent to cover pregnancy discrimination, *see* 8 Cong. Rec. 5804, 5810, 5811 (1972) (remarks of Sen. Bayh). The Department of Education's [9] regulations

have interpreted § 1681 consistent with this intent for over forty years, and Congress has never seen fit to modify or abrogate this interpretation. *See* 40 Fed.Reg. 24140, 24142 (June 4, 1975); *accord* 34 C.F.R. § 106.40 (2015); *see also* 121 Cong. Rec. 23846 (1975) (remarks of Sen. Jesse Helms decrying HEW regulations for protecting the jobs of "unwed, pregnant schoolteacher[s]" and for "allow[ing] unwed, pregnant students to continue to remain in class," during failed attempt to amend Title IX to permit discrimination on basis of "actual or potential marital or parental status"); *but cf.* Pub.L. No. 93–568, § 3(a), 88 Stat. 1855, 1862 (1974) (responding to HEW regulations by amending Title IX to exempt fraternities and sororities); Pub.L. No. 94–482, § 412, 90 Stat. 2234 (1976) (responding to HEW regulations by amending Title IX to exempt, inter alia, beauty pageant scholarships). And finally, separating sex discrimination from pregnancy discrimination just defies common sense. *See, e.g., Delva,* 137 So.3d at 375 ("embracing the common-sense reasoning ... that pregnancy is a natural condition unique to women and a primary characteristic of the female sex .... [and that] the capacity to become pregnant is one of the most significant and obvious distinctions between the female and male sexes" in holding that discrimination based on "pregnancy is in fact discrimination based on sex" (citations and internal quotation marks omitted)); *Mass. Elec.,* 375 N.E.2d at 1198 (citing same reasoning in context of Massachusetts antidiscrimination law); *see also AT & T Corp. v. Hulteen,* 556 U.S. 701, 727, 129 S.Ct. 1962, 173 L.Ed.2d 898 (2009) (Ginsburg, J., dissenting) (discussing reasoning required to conclude pregnancy discrimination is not sex discrimination: "[I]t might appear to

---

9. The Department of Health, Education, and Welfare ("HEW") was originally responsible for administering Title IX. *See N. Haven,* 456

U.S. at 541 n. 1, 102 S.Ct. 1912. Its duties under Title IX were later transferred to the Department of Education. *Id.*

the lay mind that we are treading on the brink of a precipice of absurdity. Perhaps the admonition of Professor Thomas Reed Powell to his law students is apt[:] If you can think of something which is inextricably related to some other thing and not think of the other thing, you have a legal mind." (alteration in original) (quoting *Wetzel v. Liberty Mut. Ins. Co.*, 372 F.Supp. 1146 (W.D.Pa.1974))).[10] Thus, the Court finds the Department of Education's interpretation of § 1681's prohibition of discrimination "on the basis of sex" to include pregnancy discrimination reasonable.

 Regulations applying a statute's ban on discrimination, if valid and reasonable, "authoritatively construe the statute itself." *Alexander v. Sandoval*, 532 U.S. 275, 284, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (construing Title VII implementing regulations). "A Congress that intends the statute to be enforced through a private cause of action intends the authoritative interpretation of the statute to be so enforced as well." *Id.*; *see also Global Crossing Telecomms., Inc. v. Metrophones Telecomms., Inc.*, 550 U.S. 45, 54, 127 S.Ct. 1513, 167 L.Ed.2d 422 (2007) ("Insofar as the statute's language is concerned, to vio-

late a regulation that lawfully implements [a statute's] requirements is to violate the statute [itself].").[11] There is no dispute that for more than thirty-five years, the Supreme Court has interpreted Title IX to provide a private right of action for students who suffer discrimination on the basis of sex. *See Jackson*, 544 U.S. at 173, 125 S.Ct. 1497; *Cannon v. Univ. of Chicago*, 441 U.S. 677, 690–93, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979). Therefore, the Court finds that pursuant to 34 C.F.R. § 106.40's authoritative interpretation of § 1681, a student may exercise a private right of action for sex discrimination under § 1681 when the student suffers discrimination on the basis of pregnancy. *See Varlesi v. Wayne State Univ.*, 909 F.Supp.2d 827, 854 (E.D.Mich.2012) ("[P]regnancy discrimination ... is unquestionably covered as a subset of sex discrimination under Title IX...."); *McConaughy v. Univ. of Cincinnati*, No. 1:08–CV–320–HJW, 2011 WL 1459292, at *8 (S.D.Ohio Apr. 15, 2011) (construing § 1681's sex-discrimination prohibition to include pregnancy discrimination based on 34 C.F.R. § 106.40(a)); *Hogan v. Ogden*, No. CV–06–5078–EFS, 2008 WL 2954245, at *9 (E.D.Wash. July 30, 2008) (same); *Chip-

**10.** Justice Ginsburg dissented from the majority's opinion upholding an accrual of benefits calculation made by AT & T during the two years between the hand-down of *Gen. Elec. Co. v. Gilbert*, 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), which held that an accrual rule limiting seniority credit for time taken for pregnancy leave did not constitute sex discrimination, and the Pregnancy Discrimination Act, 42 U.S.C. § 2000e(k), which overruled *Gilbert*. *See Hulteen*, 556 U.S. at 715, 129 S.Ct. 1962. The majority reasoned that the Pregnancy Discrimination Act did not apply retroactively. *See id.* The reasoning in *Gilbert*, which NFSC relies on here, is discussed in more detail infra.

**11.** NFSC contends that *Sandoval*, 532 U.S. at 291, 121 S.Ct. 1511, holds that a statute's implementing regulations do not carry with

them an implied right of action, and therefore Conley cannot bring her lawsuit on the basis of the prohibition on pregnancy discrimination contained in 34 C.F.R. § 106.40. The holding in *Sandoval* was not nearly so sweeping, however. In *Sandoval*, "the Court found that an implied right of action to enforce one statutory provision, 42 U.S.C. § 2000d, did not extend to regulations implementing another, § 2000d1–1." *Global Crossing*, 550 U.S. at 59, 127 S.Ct. 1513. Nothing in *Sandoval* requires a court to "limit [its] deference" to an agency's reasonable interpretation of a statute's language through implementing regulations. *Id.* Rather, *Sandoval*, 532 U.S. at 286–87, 121 S.Ct. 1511, stands for the proposition that there is no private right of action to enforce a regulation shorn of a statutory foundation.

*man,* 30 F.Supp.2d at 978 (same); *Darian v. Univ. of Mass. Boston,* 980 F.Supp. 77, 91 (D.Mass.1997) (same); *Hall v. Lee Coll., Inc.,* 932 F.Supp. 1027, 1032 (E.D.Tenn. 1996) (same); *Ivan v. Kent State Univ.,* 863 F.Supp. 581, 586 (N.D.Ohio 1994) *aff'd,* 92 F.3d 1185 (6th Cir.1996) (analyzing discrimination claim by pregnant graduate teaching assistant under § 1681).

NFSC argues that *Geduldig v. Aiello,* 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), which upheld the constitutionality of excluding pregnancy coverage under California's disability insurance plan, and *General Electric Co. v. Gilbert,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976), which upheld a similar limitation in an employer's disability plan under Title VII, dictate a different result. The Court disagrees, and finds these cases unpersuasive for several reasons. First, neither of these cases had anything to do with Title IX. Second, *Geduldig* was based on the Supreme Court's construction of the Equal Protection Clause of the Fourteenth Amendment, which obviously is not subject to authoritative regulatory interpretation in the same way as § 1681 is under *Chevron.* Third, although *Gilbert* did briefly consider the impact of a regulation construing Title VII's sex-discrimination prohibition to include pregnancy, *see* 429 U.S. at 141, 97 S.Ct. 401, the case was decided pre-*Chevron.* Unlike earlier cases, which gave varying degrees of deference to administrative interpretations based on their persuasiveness, *Chevron* established that courts must afford a high degree of deference to reasonable administrative interpretations made pursuant to and promulgated in exercise of a Congressional delegation of authority. *See, e.g., Mead,* 533 U.S. at 229, 121 S.Ct. 2164; *see also* Thomas W.

Merril & Kristin E. Hickman, *Chevron's Domain,* 89 Geo. L.J. 833, 833 (2001) (observing *Chevron* "dramatically expanded the circumstances in which courts must defer to agency interpretations of statutes"). As explained supra, 34 C.F.R. § 106.40 merits this heightened level of deference. Moreover, Congress delegated much less authority to the Equal Employment Opportunity Commission to promulgate the regulation considered in *Gilbert* than it did to the Department of Education to promulgate § 106.40. *Compare Gilbert,* 429 U.S. at 141, 141 n. 20, 97 S.Ct. 401 (observing that the EEOC had only been given "authority from time to time to issue ... suitable procedural regulations" (quoting 42 U.S.C. § 2000e–12)), *with* § 1682 (giving Department of Education authority "to effectuate the provisions of section 1681 ... by issuing rules, regulations, or orders of general applicability"). Lastly, and perhaps most significantly, Congress rejected the reasoning in *Geduldig* and its progeny *Gilbert,* when it explicitly overturned *Gilbert* by passing the Pregnancy Discrimination Act. *See Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.,* 462 U.S. 669, 678–79, 103 S.Ct. 2622, 77 L.Ed.2d 89 (1983). In *Newport News,* the Court explained that the "*Gilbert* opinion quoted at length from a footnote in *Geduldig*" for its reasoning that "an exclusion of pregnancy from a disability-benefits plan providing general coverage is not a gender-based discrimination at all." *Id.* at 676, 103 S.Ct. 2622 (quoting *Gilbert,* 429 U.S. at 136, 97 S.Ct. 401). The Court explained further that Congress's enactment of the Pregnancy Discrimination Act not only overruled *Gilbert's* holding that Title VII's prohibition of sex discrimination does not bar exclusion of pregnancy-related disabilities coverage,[12] but also ex-

---

12. Prior to *Gilbert,* every federal appeals court presented with the question had rejected the proposition that sex discrimination did not include pregnancy discrimination. *See*

*Commc'n Workers of Am. v. AT & T Co., Long Lines Dept.,* 513 F.2d 1024 (2d Cir.1975); *Wetzel v. Liberty Mut. Ins. Co.,* 511 F.2d 199

plicitly rejected its reasoning that pregnancy discrimination was not discrimination on the basis of sex. *Newport News,* 462 U.S. at 678, 103 S.Ct. 2622; *Young v. United Parcel Serv., Inc.,* — U.S. —, 135 S.Ct. 1338, 1353, 191 L.Ed.2d 279 (2015) ("[T]he first clause of the [Act] reflects Congress' disapproval of the reasoning in *Gilbert.*" (second alteration in original) (quoting *Cal. Fed. Sav. & Loan Assn. v. Guerra,* 479 U.S. 272, 284, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987))); H.R.Rep. No. 95–948, at 3–4 (1978) ("[T]he Supreme Court's narrow interpretations of Title VII tend to erode our national policy of nondiscrimination in employment. .... [T]he assumption that women will become pregnant and leave the labor force ... is at the root of the discriminatory practices which keep women in low-paying and dead-end jobs.... If ... Congress were not to clarify its original intent, and the Supreme Court's interpretations of Title VII were allowed to stand, Congress would yield to an intolerable potential trend in employment practices."). Thus, the Pregnancy Discrimination Act merely "clarified" what Congress had intended all along, i.e., that Title VII's sex-discrimination prohibition includes pregnancy discrimination. *Newport News,* 462 U.S. at 678–81, 103 S.Ct. 2622; S.Rep. No. 95–331, at 7–8 (1977) ("[T]he bill is merely reestablishing the law as it was understood prior to *Gilbert* ...."); 123 Cong. Rec. 10582 (1977) (remarks of Rep. Hawkins) ("H.R. 5055 does not really add anything to title VII as I and, I believe, most of my colleagues in Congress when title VII was enacted in 1964 and amended in 1972, understood the prohibition against sex discrimination in employment. For, it seems only common-sense, that since only women can become pregnant, discrimination against pregnant people is necessarily discrimination against women, and that forbidding discrimination based on sex therefore clearly forbids discrimination based on pregnancy."); *id.* at 29387 (remarks of Sen. Williams) ("[T]his bill is simply corrective legislation, designed to restore the law with respect to pregnant women employees to the point where it was last year, before the Supreme Court's decision in *Gilbert* ...."); *id.* at 29647; *id.* at 29655 (remarks of Sen. Javits) ("What we are doing is leaving the situation the way it was before the Supreme Court decided the *Gilbert* case last year."); 124 Cong. Rec. 36819 (1978) (remarks of Sen. Stafford) ("Congress in 1964 ... intended to prohibit discrimination in employment on the basis of pregnancy when it enacted the original Civil Rights Act."); *id.* at 21436 (remarks of Rep. Sarasin) ("This bill would restore the interpretation of title VII prior to that decision"); *id.* at 21442 (remarks of Rep. Myers) ("This legislation will clarify the original intent of Congress that sex discrimination in [T]itle VII includes pregnancy-based discrimination."); *id.* at 21440 (remarks of Rep. Thompson) ("H.R. 6075 seeks only to clarify what most feel was the original intent of Congress in enacting the Civil Rights Act–that the [T]itle VII prohibitions against sex discrimination in employment include discrimination based on 'pregnancy, childbirth, or related medical conditions.' ").

Although it is true that Congress has never amended Title IX's definition of sex to explicitly include pregnancy, the Court is not persuaded that this fact signals Congress's intent on the matter. Congress passed the Pregnancy Discrimination Act in direct response to a Supreme Court

(3d Cir.1975); *Gilbert v. Gen. Elec. Co.,* 519 F.2d 661 (4th Cir.1975); *Satty v. Nashville Gas Co.,* 522 F.2d 850 (6th Cir.1975); *Holthaus v. Compton & Sons, Inc.,* 514 F.2d 651 (8th Cir.1975); *Berg v. Richmond Unified Sch. Dist.,* 528 F.2d 1208 (9th Cir.1975); *Hutchison v. Lake Oswego Sch. Dist. No. 7,* 519 F.2d 961 (9th Cir.1975).

opinion that had substantively misinterpreted Title VII. *Newport News*, 462 U.S. at 678–81, 103 S.Ct. 2622. In the case of Title IX there has been no faulty precedent to overturn. Thus, the Court is not persuaded that *Gilbert* and *Geduldig* control this decision.

For the foregoing reasons, NFSC's Motion for Leave to File a Reply Memorandum in Support of its Motion to Dismiss is **GRANTED**, ECF No. 37, and NFSC's Motion to Dismiss is **DENIED**, ECF No. 23.

**DONE and ORDERED** this 12th day of November, 2015.